COMMUNITY FOR CREATIVE
NON–VIOLENCE, et al.,
Plaintiffs,

v.

James Earl REID, et al., Defendants.

Civ. A. No. 86–1507.

United States District Court,
District of Columbia.

Feb. 9, 1987.

Timothy D. Junkin, Washington, D.C., for plaintiffs.

William Zinman, Baltimore, Md., for defendants.

## DECISION AND ORDER

JACKSON, District Judge.

Plaintiffs Community for Creative Non-Violence ("CCNV"), a Washington-based non-profit unincorporated association of persons committed to the causes of the homeless people of America, and its agent, Mitch Snyder, sue James Earl Reid, a Baltimore sculptor and his photographer colleague, Ronald Purtee, for relief under the Copyright Act of 1976, 17 U.S.C. §§ 101–702 (the "Act"), to determine and enforce their rights with respect to a statue sculpted by Reid pursuant to an oral agreement with Snyder in the fall of 1985.[1] Specifically, CCNV and Snyder pray that they be declared the owners of the copyright, and that Reid (and anyone else claiming with him) be permanently enjoined from infringing upon that copyright in any manner.[2] Upon the following facts, as found by the Court in accordance with Fed.R. Civ.P. 52(a) upon trial without a jury, the Court concludes, for the reasons stated, that judgment must be given for plaintiffs and the relief prayed, in substance, be granted.

### I.

In late September or early October, 1985, at a friend's suggestion, Snyder determined that CCNV would sponsor a display at the forthcoming national Christmastime Pageant of Peace on the Ellipse in Washington, D.C., to dramatize the plight of the nation's homeless. Snyder and fellow CCNV members conceived the idea for the nature of the display: a sculpture of a modern Nativity scene in which, in lieu of the traditional Holy Family, the two adult figures and the infant would appear as contemporary homeless people huddled on a streetside steam grate. The family was to be black (most of the homeless in Washington being black); the figures were to be life-sized, and the steam grate would be positioned atop a platform "pedestal," or base, within which special-effects equipment would be enclosed to emit simulated "steam" through the grid to swirl about the figures. They also settled upon a title for the work—"Third World America"—and a legend for the pedestal: "and still there is no room at the inn."

Snyder then made inquiries to locate an artist to do the work and was referred by a mutual artist-acquaintance in Massachusetts to James Earl Reid. The agreement between Snyder and Reid was reached in the course of two telephone calls in October, 1985. Reid, enthusiastic from the outset about the project, at first proposed that the work be cast in bronze, at a total cost approaching $100,000 or more, and taking six to eight months to complete. Told by Snyder that CCNV did not have such a sum to spend, and that the statue had to be completed by December 12th to be included in the Pageant of Peace, Reid suggested an alternative material known as "Design Cast 62," a synthetic substance with which he could work more quickly and would cost substantially less. Reid assured Snyder that Design Cast 62 was sufficiently durable to withstand the elements—"as strong as concrete," according to Snyder—and could be tinted to resemble bronze. Snyder agreed to the use of Design Cast 62. Reid then estimated the cost at $12,000 to "no more than" $15,000, not including his services which he offered to donate, and Snyder assented to the price. Reid then promised to endeavor to meet the deadline, and the bargain was complete. Neither party mentioned copyright.[3]

---

1. Although named as a defendant, Purtee has not appeared, and has made no claim to any interest in the statue, in this case.

2. Plaintiffs' claims for statutory damages and attorneys' fees were withdrawn at trial.

3. Reid testified that he imposed two other conditions which Snyder expressly accepted: that

Reid commenced work immediately, making sketches of individual figures in possible poses, and CCNV members made plans for an art auction to raise funds by selling works donated by other artists in sympathy with their cause. About November 1st CCNV paid Reid an advance of $3,000, and Reid sent CCNV a sketch of a proposed arrangement of the figures showing the family in a "classic" creche-like relationship to one another: the mother seated (as if on a chair, although the object is not shown), cradling the infant in her lap, and the father standing behind her, bending over her right shoulder to touch the infant's foot with his right hand.[4]

Shortly thereafter Reid asked Snyder if he knew of a black family who could pose as models, and Snyder promptly suggested a family living at CCNV's Washington shelter whose baby had recently been born there, inviting Reid to visit them and decide for himself. Reid did so, and rejected the adults, whose appearances he found inappropriate, but accepted the child. (He ultimately used Mr. Purtee and a female acquaintance as his adult models.) While in Washington Snyder took Reid on a brief tour of nearby steam grates to observe homeless people in their habitat, pointing out to him that they were wont to recline, rather than sit or stand, on the grates to warm their entire bodies, and from that time all Reid's representations of the proposed statue contemplated recumbent figures only.[5]

Throughout November and the first two weeks of December Reid worked long hours exclusively on the statue, assisted at various times by a dozen different people, all paid by him, from funds, however, provided by CCNV. (It is undisputed that CCNV paid Reid the full price of $15,000). From the time of his construction of the armature through the final clay rendering he was visited on a number of occasions by various CCNV members, ostensibly to check on his progress and to coordinate CCNV's construction of the base or pedestal. (In the meantime CCNV had ordered the special-effects equipment from sources in Hollywood at a cost of $7,000–$8,000.) On no occasion was the subject of copyright mentioned.

The clay model was ready for casting on or about December 12th, but the mold not yet made, when Snyder telephoned Reid to demand that the statue be delivered immediately or it would be excluded from the Pageant of Peace.[6] Reid replied that it simply could not be done, and was then told by Snyder to take the time necessary to permit him to deliver a "first class work." He did so, and delivered the finished "Third World America" to the Ellipse himself on December 24, 1985, receiving a final payment of $3,000 from Snyder.[7]

he would "reserve his full copyright rights" in the work, and retain "total [artistic] control." The Court finds otherwise. Not only is the testimony without any corroboration, but the conditions themselves are inconsistent with the tenor of the enterprise. Neither Reid nor Snyder were thinking of the venture in profit-making terms at the time (although Snyder had some thoughts about the statue's fundraising potential in the future), and Snyder and CCNV had specific ideas about the sculpture's ultimate appearance which they would have been unwilling to surrender to someone else's "control," even the artist's.

4. Reid says Snyder asked for the sketch for "fundraising" purposes. Snyder says it was also for his "approval," which Reid denies.

5. Reid says that he had always known that people lie on steam grates, and had planned the statue that way himself. His preliminary sketch suggests, and the Court finds, otherwise.

Reid also says it was his idea to use the shopping cart as the repository for the family's personal belongings, as it appears in the completed statue, but four CCNV witnesses (including the artist from Massachusetts who worked as Reid's assistant throughout) testified, and the Court again finds, that Reid at first favored "suitcases" or "shopping bags," but was persuaded by Snyder and CCNV members to use a shopping cart as an accessory more typical of the homeless.

6. In fact, the statue was rejected by Pageant officials, who declined for policy reasons to accept any display with what might be regarded as a political message, and was eventually exhibited at a nearby site.

7. Immediately beneath the title on the finished work, which appears in raised letters on the box in which the baby lies, Reid inscribed the letter "C," encircled, and his name, to indicate his claim to a copyright for it, a claim the Court finds to have been made for the first time on December 24th.

The statue remained on display near the Ellipse for a month. In late January, 1986, CCNV members returned the statue to Reid's studio in Baltimore for repair of some minor damage done in its transit to the Ellipse. In mid-February, Snyder began making plans to take the statue on a tour of several cities and exhibit it at major galleries to raise money for the homeless. Reid came to Washington, accompanied by a lawyer, to protest that the Design Cast 62 material was not strong enough to withstand the rigors of travel and to urge CCNV to have the statue cast in bronze for about $35,000, or at least to have a "master mold" made, at a cost of $5,000, to permit a duplicate to be cast if the original were irreparably damaged. Snyder declined to expend any more of CCNV's money on the project, but invited Reid to do spend his own if he wished. Several weeks later Snyder called Reid to demand return of the statue, following which, without returning it, Reid filed a Certificate of Copyright Registration for it in his name with the Copyright Office, Library of Congress, on March 20, 1986, and announced plans for a more modest exhibition tour of his own for the statue.[8] This lawsuit ensued on June 2, 1986, in connection with which plaintiffs sought and obtained a preliminary injunction restoring the statue to their possession.

## II.

The Copyright Act declares that "[c]opyright in a work ... vests initially in the author or authors," 17 U.S.C. § 201(a), and, "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author ... [and] owns all of the rights comprised in the copyright" unless otherwise expressly agreed in writing. *Id.*, § 201(b). A copyright can be conveyed, *id.*, § 201(d), but only in writing, *id.*, § 204(a), and in this case there is neither an agreement in writing between the parties as to ownership of the copyright in "Third World America," nor a unilateral instrument in writing purporting to convey it. Consequently, ownership of the copyright turns upon the identi-

ty of the statutory "author," which, in turn, depends upon whether the statue is a "work made for hire."

 A "work made for hire" is defined, for purposes of this case, as "a work prepared by an employee within the scope of his or her employment....," *id.*, § 101, but for statutory copyright purposes generally, the employment relationship giving rise to a copyright is somewhat more expansive than the master-servant relationship found in the common law of agency. Under the Act one may be an employee "regardless of whether he is paid on the basis of a conventional periodic salary, on a piece work basis, on a fee or royalty basis, or even if [he works] as an accommodation with no compensation at all." 1 Nimmer on Copyright, § 5:03[B][1][a] (1985). If the putative "employer" was either the "motivating factor" in the production of the work, or possessed the right to "direct and supervise" the manner in which the work was done, the copyright is his no matter the degree of creative license actually exercised by the artist-employee. *Id.; Murray v. Gelderman*, 566 F.2d 1307, 1310–11 (5th Cir.1978); *see also Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 552 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984); *Town of Clarkstown v. Reeder*, 566 F.Supp. 137, 141–42 (S.D.N.Y. 1983).

 It is indisputable on this record that plaintiff CCNV was the motivating factor in the procreation of "Third World America." Snyder and his colleagues not only conceived the idea of a contemporary Nativity scene to contrast with the national celebration of the season, they did so in starkly specific detail. They then engaged Reid to utilize his representational skills, rather than his original artistic vision, to execute it. And while much was undoubtedly left to his discretion in doing so, CCNV nevertheless directed enough of his effort to assure that, in the end, he had produced what they, not he, wanted, notwithstanding his creative instincts may have been in harmony with theirs. Finally,

---

**8.** Snyder also registered a copyright, in his own name, on May 21st.

they paid in full for the work, making their final payment only when satisfied, upon delivery, that the statue did, indeed, convey the message they had intended for it.

Reid could have bargained with CCNV for the copyright but did not do so. Consequently he will have to content himself with the considerable acclaim the statue has and will receive, and the public's recognition of him as the talented artist who executed it. But in the absence of a writing to the contrary, the law leaves no doubt that "Third World America" is a work made for hire, and CCNV the exclusive owner of the copyright therein.

For the foregoing reasons, therefore, it is, this 9th day of February, 1987,

ORDERED, that judgment be entered for plaintiffs; and it is

FURTHER ADJUDGED and DECLARED, that the copyright in and to that work of sculpture known as "Third World America" is vested exclusively in Mitch Snyder, trustee, for the use and benefit of the Community for Creative Non-Violence, a voluntary unincorporated association; and it is

FURTHER ORDERED, that Certificate of Copyright Registration for "Third World America" No. VAU 90–127 of March 20, 1986, in the name of James Earl Reid is declared null and void, and is cancelled; and it is

FURTHER ORDERED, that defendants James Earl Reid and Ronald Purtee, their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, are permanently enjoined from exercising, or attempting to exercise, any of those rights enumerated in 17 U.S.C. § 106 with respect to the work of sculpture known as "Third World America," except as otherwise provided in 17 U.S.C. §§ 107–18.