**COMMUNITY FOR CREATIVE NON–VIOLENCE, et al.**

v.

**James Earl REID, Appellant.**

**No. 87–7051.**

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 29, 1988.

Decided May 20, 1988.

As Amended May 20 and May 31, 1988.

---

Robert S. Schlossberg, with whom William L. Gardner and Grace E. Speights, Washington, D.C., were on the brief, for appellant.

Terri A. Southwick, of the bar of the Court of Appeals of the District of Columbia, pro hac vice, by special leave of Court, with whom Timothy D. Junkin and L. Barrett Boss, Washington, D.C., were on the brief, for appellees.

Charles D. Ossola, Washington, D.C., for amicus curiae, The Copyright Justice Coalition.

Before MIKVA, RUTH BADER GINSBURG, and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

This case calls for interpretation of the "work made for hire" prescriptions of the Copyright Act of 1976 (1976 Act), 17 U.S.C.

§§ 101, 201 (1982).[1] The issue is novel in this circuit and has divided sister courts. *Compare Easter Seal Society for Crippled Children and Adults of Louisiana, Inc. v. Playboy Enterprises,* 815 F.2d 323 (5th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1280, 99 L.Ed.2d 491 (1988), *with Aldon Accessories Ltd. v. Spiegel, Inc.,* 738 F.2d 548 (2d Cir.), *cert. denied,* 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984), *and Evans Newton Inc. v. Chicago Sys. Software,* 793 F.2d 889 (7th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986).

In the case at hand, the district court held the work for hire doctrine applicable and rested its judgment for the plaintiff on that doctrine. Following the path marked by the Fifth Circuit, we rule that case law on works made for hire developed under the Copyright Act of 1909 (1909 Act) no longer holds sway; in accord with *Easter Seal Society,* 815 F.2d at 324, we conclude that the "1976 Act has greatly restricted the scope of the 'work for hire' doctrine." Based on the construction we hold proper under the current Act, we reverse the district court's judgment and remand the instant case for further proceedings.

## I.

Plaintiff-appellee in this case, the Community for Creative Non–Violence (CCNV), is a Washington, D.C.-based non-profit unincorporated association devoted to the welfare of homeless people. In the fall of 1985, CCNV decided to participate in the annual Christmas Pageant of Peace in D.C. by sponsoring a display that would dramatize the plight of the homeless. As the district court recounted, Mitch Snyder, CCNV's agent and trustee (also named as a plaintiff-appellee in this action), and other CCNV members

> conceived the idea for the nature of the display: a sculpture of a modern Nativity scene in which, in lieu of the traditional Holy Family, the two adult figures and the infant would appear as contemporary homeless people huddled on a streetside steam grate. The family was to be black (most of the homeless in Washington being black); the figures were to be life-sized, and the steam grate would be positioned atop a platform "pedestal," or base, within which special-effects equipment would be enclosed to emit simulated "steam" through the grid to swirl about the figures. They also settled upon a title for the work—"Third World America"—and a legend for the pedestal: "and still there is no room at the inn."

*Community for Creative Non–Violence v. Reid,* 652 F.Supp. 1453, 1454 (D.D.C.1987).

Snyder contacted James Earl Reid, a Baltimore sculptor and defendant-appellant herein; in the course of two telephone calls in October 1985, CCNV and Reid reached an agreement. Reid promised to sculpt the three human figures for "Third World America" and a shopping cart containing their meager belongings; he agreed to use a synthetic substance called "Design Cast 62" that could be tinted to resemble bronze. CCNV assumed responsibility for the steam grate and the pedestal. For a total outlay of approximately $7,000–$8,000, CCNV engaged a cabinetmaker to construct the pedestal, obtained the special-effects equipment from a company in California, and acquired the chemicals needed to produce the simulated steam from Mobil Oil Company in New Jersey. The parties agreed that Reid's portion of the sculpture would cost no more than $15,000, not counting the sculptor's own services, which Reid donated to the venture; they further agreed that Reid's work would be delivered to CCNV by December 12 for attachment to the base preparatory to display of the total creation in the Pageant. Neither party mentioned copyright.

Reid and his assistants worked on the figures for the sculpture throughout November and December, conferring from time to time with various CCNV members and making changes to the form and arrangement of the figures to accommodate

---

**1.** The expression in the statute is "work made for hire." We employ here interchangeably the shorter term, "work for hire."

CCNV's requests. On December 24, 1985, Reid delivered his portion of "Third World America" to D.C. where it was joined to the steam grate pedestal and placed on display near the site of the Pageant. At that time, Reid received $3,000 from Snyder, the final installment of the $15,000 total payment due to him under the agreement.

In late January 1986, CCNV sent the entire sculpture to Reid so that he could repair damage to the foot of the male figure that occurred in the original transportation from Baltimore to D.C. The following month, CCNV began making plans to take the sculpture on a tour of several cities to raise money for the homeless. Reid objected to the planned tour insisting that the Design Cast 62 material was too delicate to withstand the ambitious itinerary; he urged CCNV to cast "Third World America" in bronze or to have a "master mold" made. CCNV declined to fund these additional undertakings but invited Reid to do so at his own expense.

In March 1986 CCNV asked Reid to return the sculpture; Reid refused. He filed a certificate of copyright registration for "Third World America" in his own name on March 20, 1986,[2] and announced his own plans to take the sculpture on an exhibition tour more moderate than the one CCNV had projected. Snyder filed a competing certificate of copyright registration in his name on May 21, 1986.[3] On June 2, 1986, CCNV commenced this litigation against Reid. The complaint sought return of the sculpture and a determination of copyright ownership. On July 25, 1986, the district court granted a preliminary injunction ordering Reid to return the sculpture to CCNV. On February 9, 1987, after a two-day bench trial, the district court declared "Third World America" a work made for hire whose copyright is owned exclusively by CCNV. Reid timely appealed that final decision.

## II.

The 1976 Act prescribes that copyright ownership [4] "vests initially in the author or authors of the work," and that "authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). As to a work made for hire, the Act provides that

> the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed

---

**2.** Beneath the title of the sculpture, which was molded into the human figure portion of the work, Reid had placed a copyright notice: "© James Earl Reid, Sculptor 85." This measure, which Reid took before the creation was displayed in D.C., *see* 652 F.Supp. at 1455 n. 7, was unnecessary to secure any copyright protection to which Reid might be entitled. Generally, a notice of copyright is required upon publication of copies of a copyrighted work. 17 U.S.C. § 401(a). However, a public display is not a publication. 17 U.S.C. § 101 ("A public performance or display of a work does not of itself constitute publication.").

**3.** Snyder filed the certificate of copyright registration in his own name without mentioning CCNV. The district court indicated, however, that Snyder's registration was as CCNV's trustee. *See* 652 F.Supp. at 1457 (declaring copyright vested "in Mitch Snyder, trustee, for the use and benefit of the Community for Creative Non–Violence"). On the prudence of this filing in light of the voluntary and unincorporated nature of CCNV, *see Motta v. Samuel Weiser, Inc.,* 768 F.2d 481 (1st Cir.1985) (where membership of unincorporated association is too fluid, association is not capable of owning property). For convenience, we will refer to CCNV as the plaintiff-appellee and putative author of "Third World America."

**4.** The dispute between CCNV and Reid concerns only ownership of *copyright* in "Third World America," not ownership of the sculpture itself. *See* 17 U.S.C. § 202 (ownership of copyright is distinct from ownership of material object). Having paid Reid the agreed price of $15,000, CCNV owns the sculpture. Ownership of a particular copy of a copyrightable work—in this case the original "copy," *see* 17 U.S.C. § 101 ("[t]he term 'copies' includes the material object ... in which the work is first fixed")—vests certain rights under the 1976 Act in that owner. Among these are the right to "sell or otherwise dispose of the possession of that copy" and the right to "display that copy publicly." 17 U.S.C. § 109(a), (c). In light of this distinction between ownership of a particular copy and ownership of a copyright, Reid's retention of the sculpture—the behavior that precipitated CCNV's plea for a preliminary injunction—lacked legal foundation. Even if Reid had solely owned the "Third World America" copyright, CCNV's exclusive ownership of the sculpture itself would have left Reid with no right to possess that material object. *See infra* pp. 1498–99.

otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright.

17 U.S.C. § 201(b). "Work made for hire" is defined in the Act as

(1) a work prepared by an employee within the scope of his or her employment; or

(2) a work specially ordered or commissioned for use [1] as a contribution to a collective work, [2] as a part of a motion picture or other audiovisual work, [3] as a translation, [4] as a supplementary work, [5] as a compilation, [6] as an instructional text, [7] as a test, [8] as answer material for a test, or [9] as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire....

17 U.S.C. § 101 (numbers in brackets added). Our task is to determine where the contending parties fit within this statutory framework, specifically, is Reid an "author" of the sculpture "Third World America," as that term is used in the section on ownership of copyright, § 201, or is CCNV the only party "considered the author"? The provision in § 101 defining "work made for hire" is key to this inquiry.

The first subpart of the § 101 "work made for hire" definition concerns work prepared in an "employment" setting; the second concerns works "specifically ordered or commissioned." Does the distinction Congress made between "employment" in § 101(1) and "commissioned" work in § 101(2) mean, the Fifth Circuit asked in *Easter Seal Society*, 815 F.2d at 328, that the work of an independent contractor can be placed in the "work made for hire" category only when the work is of a type § 101(2) describes in its nine tightly-drawn categories (and, even then, only when the parties so agree)? The Fifth Circuit, in disagreement with the Second and Seventh Circuits, answered this question affirmatively.[5] We set out below the conflicting interpretations advanced in re-cent circuit decisions, align ourselves with the Fifth Circuit's position, and then consider whether "Third World America" may qualify as a joint work of art, with copyright in the work co-owned by two or more authors. *See* 17 U.S.C. § 101 (definition of "joint work").

## A. *The Second and Seventh Circuit Interpretation*

The 1909 Act defined the word "author" to include an employer in the case of works made for hire, 17 U.S.C. § 26 (repealed 1976), but did not further delineate the "work made for hire" domain. Case law interpreting that Act treated expansively the relationships that qualified under the employer-employee rubric; a test of actual control by the commissioning party slackened to become a right to control (even if not exercised) standard. Ultimately, a firm presumption developed under which virtually "any person who paid another to create a copyrightable work" counted as the statutory "author" within the compass of the work for hire doctrine. *See Easter Seal Society*, 815 F.2d at 327; *see generally* Hamilton, *Commissioned Works as Works Made for Hire Under the 1976 Copyright Act: Misinterpretation and Injustice*, 135 U. PA. L.REV. 1281, 1282–89 (1987). First among the federal courts of appeals to consider what change the 1976 Act had wrought in the work for hire domain, the Second Circuit, in *Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 321 (1984), held that only a modest alteration had been made: Congress had corrected exorbitant case law that "worked an injustice in those situations where the contracting party did all of the creative work and the hiring party did little or nothing." 738 F.2d at 552.

*Aldon Accessories* noted the two subsections of the statutory (§ 101) "work made for hire" definition, and emphasized the first subsection: "a work prepared by an employee within the scope of his or her

**5.** In *Brunswick Beacon, Inc. v. Schock–Hopchas Publishing Co.*, 810 F.2d 410 (4th Cir.1987), the Fourth Circuit, although rejecting the specific work for hire assertion there at issue, indicated its agreement with the Second Circuit.

employment." That subsection, according to the Second Circuit, retains in place prior case law ranking as "employees" whose labors yield works for hire "[independent] contractors who were actually sufficiently supervised and directed by the hiring party." *Id.*[6] Under *Aldon Accessories,* if there is the requisite supervision and control, the commissioning party is deemed the author and sole owner of copyright in the work.[7]

In more cryptic statement, *Aldon Accessories* addressed the second subsection of § 101's "work made for hire" definition, the subsection delineating nine categories of "specially ordered or commissioned" works. Assuming the absence of the supervision-by-hiring-party ingredient, *Aldon Accessories* recognized that the independent contractor in these situations is sole author and copyright owner unless, as § 102(2) stipulates, "the parties expressly agree in a written instrument signed by them that the work should be considered a work made for hire." *Aldon Accessories* did not home in on the case of the independent contractor who is not "sufficiently supervised and directed by the hiring party," but whose commissioned work is not within the nine categories set out in § 101's second subsection.

We pause here to observe that unlike the instant case, in which artist and commissioning party vie for ownership of a copyright, *Aldon Accessories* pitted the commissioning party (to boot, a genuinely creative participant) against a third-party infringer (and a blatant one at that). Plaintiff Aldon Accessories Ltd. (Aldon) was in the business of designing and marketing decorative objects. In 1977, one of Aldon's two principals conceived of a novel line of statuettes depicting mythical creatures, notably, a Pegasus and a unicorn. Aldon first commissioned a Japanese firm to aid in the design of the figurines and to produce the creations in porcelain. Some two years later, Aldon commissioned a Taiwanese firm to produce brass versions of the statuettes. In 1980, Aldon filed certificates of copyright registration for the statuettes; Aldon listed itself as the author but indicated that the works were "made for hire." In 1981 a buyer for Spiegel, Inc. (Spiegel) saw Aldon's brass unicorn at a gift show. At the Spiegel buyer's request, Aldon sent samples. By mid–1981, Spiegel was selling through its catalog brass unicorns identical to Aldon's. Aldon sued Spiegel for copyright infringement.

On appeal from a judgment for Aldon, Spiegel argued that the statuettes could not be works made for hire under the 1976 Act because statuary does not fall into one of the nine categories enumerated in the second subsection of the § 101 definitional

---

**6.** Doubtless, the *Aldon Accessories* court intended to apply the "actually sufficiently supervised and directed" test only to determine whether independent contractors are employees. The copyrightable work of "regular or formal" employees is work made for hire without regard to the employer's exercise of control. *See Easter Seal Society,* 815 F.2d at 334 ("Under *Aldon Accessories,* a court must still determine whether the [creator of the copyrightable work] was an employee or independent contractor because the [actual control] test applies only to independent contractors.").

**7.** The attribution under the work for hire doctrine of authorship as well as ownership of the copyright yields significantly more than would acquisition of copyright ownership alone. The copyright of a work made for hire on or after January 1, 1978 "endures for a term of seventy-five years from the year of its first publication, or a term of one hundred years from the year of its creation, whichever expires first." 17 U.S.C. § 302(c). Ownership of copyright alone, which would occur upon an author's grant of a trans-

fer or license of copyright, leaves the author with a right to terminate the grant in 35 or 40 years. *See* 17 U.S.C. § 203(a)(3). Book publishers and motion picture producers had strongly opposed complete exclusion of commissioned works from work for hire treatment in the 1976 Act; their concern focused on the author's termination right exercisable "[i]n the case of any work other than a work made for hire," 17 U.S.C. § 203(a). *See* Hamilton, *supra,* 135 U. Pa. L.Rev. at 1292 (capping discussion with pointed observation that "the creator of a work made for hire ... could never terminate the employer's right to the work"). The consequences in foreign jurisdictions of recognizing the commissioned rather than the commissioning party as author also figured in the legislative debates. *See* Angel & Tannenbaum, *Works Made for Hire Under S.22,* 22 N.Y. L. Sch. L.Rev. 209, 213–14 (1976); *see generally* 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 5.03[A] (1985) (significance of work for hire status).

provision. Therefore Aldon could not be the author and copyright owner of the brass unicorn, Spiegel contended, and could not sue for copyright infringement. Understandably, Spiegel's argument did not succeed.

The record in *Aldon* demonstrated the very active participation of Aldon's principal every step of the way, from conception of the statuettes to "[standing] over the artists and artisans at critical stages of the process, telling them exactly what to do." 738 F.2d at 553 (commenting that "in a very real sense," Aldon's principal "was the artistic creator"). In this light, Spiegel's liability for infringement could have been upheld by recognizing Aldon as at least "a co-author of the work" and, as joint owner of the copyright, one clearly "entitled to bring and win an action for infringement against a third party." *Easter Seal Society*, 815 F.2d at 333; *cf. Mister B Textiles Inc. v. Woodcrest Fabrics, Inc.*, 523 F.Supp. 21, 24 (S.D.N.Y.1981) (rejecting, upon finding co-authorship, infringer's objection that plaintiff commissioning party did not own the copyright).[8]

Two years after the Second Circuit's decision, the Seventh Circuit adopted the *Aldon Accessories* "sufficiently supervised and directed" test; in *Evans Newton Inc. v. Chicago Sys. Software*, 793 F.2d 889 (7th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 434, 93 L.Ed.2d 383 (1986), the court relied on *Aldon Accessories* to affirm a judgment of infringement against an independent contractor commissioned by the plaintiff to develop a software program. The contractor, after completing work for the plaintiff, attempted to market a competing program. In defense of its conduct, the contractor claimed it was a co-author and co-owner of the copyrighted work, and therefore could not be an infringer.

The parties in *Evans Newton* had not "expressly agree[d] in a written instrument signed by them" that the work would constitute a "work made for hire," 17 U.S.C. § 101, nor was a software program even in the § 101(2) catalog, and the court accepted the contractor's assertion that work for hire status within § 101's definition therefore turned on a characterization question: was the contractor an "employee"? *See* 793 F.2d at 893. On that question, *Aldon Accessories* instructed that the commissioning party's "supervision and direction" of the contractor was decisive. "The evidence at trial" on the point "essentially came down to a credibility contest," the court of appeals said, so that the district court's finding of sufficient supervision could not be held "clearly erroneous." *Id.* at 894.

The evidence of "actual control" in *Evans Newton*, it has been observed, was less compelling than the showing of constant direction of the work in *Aldon Accessories. See Easter Seal Society*, 815 F.2d at 334 ("[T]he 'actual control' test of *Aldon Accessories* ... slides too easily into the vague and expansive 'right to control' test, as the decision in *Evans Newton* may portend."). In the case before us, we note that the district court, while citing *Aldon Accessories* and examining with care CCNV's interactions with Reid, used language harking back to the "payor presumed to control" approach that evolved under the 1909 Act. The district court wrote: "If the putative 'employer' was either the 'motivating factor' in the production of the work, or possessed the *right* to 'direct and supervise' the manner in which the work was done, the copyright is his no matter the degree of creative license actually exercised by the artist-employee." *Community for Creative Non–Violence v. Reid*, 652 F.Supp. at 1456 (emphasis added).

---

**8.** Hamilton, *supra*, at 1302–03 & n. 118, suggests additional ways of viewing the *Aldon Accessories* situation. One might regard Aldon as sole author and owner of the copyright (Henry Moore, for example, engaging others to execute his fine art). The foreign producers thus could be seen as simply instrumental (Hamilton's analogy is the stenographer recording lines dictated by a poet). Or, the brass statuettes could be regarded as derivative of the porcelain works made in 1977 and thus subject to the 1909 Act, which remained in force until 1978, an act courts ever more certainly construed to sweep commissioned works broadly into the work for hire domain. *See supra* p. 1489; *see also* Hamilton, *supra*, at 1301 n. 112 (indicating that the Japanese and Taiwanese contractors might not have been positioned to assert protection in the U.S. against copiers of the statuettes).

## B. *The Fifth Circuit Interpretation*

■ The Fifth Circuit panel in *Easter Seal Society* confronted and comprehensively explored this stated issue: "What effect, if any, did the Copyright Act of 1976 have on the 'work for hire' doctrine developed under the 1909 Act?" 815 F.2d at 324. The *Easter Seal Society* opinion first surveys the work for hire precedent that evolved under the 1909 Act, and then identifies and discusses three distinct interpretations of the 1976 Act. 815 F.2d at 328.

The Fifth Circuit panel presented first a position it designates the "literal interpretation." Summarily stated, that interpretation reads section 101

as a reflection of a simple dichotomy in fact between employees and independent contractors. In other words, a court should first determine—using agency law rules—whether or not the seller is an employee or an independent contractor. Then, the court should apply the statute. Section 101(1) applies to sellers who are employees. If the work was in the scope of employment, an agency-law employee is a copyright employee, and the employer is the "author." Section 101(2) applies to independent contractors. All works by independent contractors—"work[s] specially ordered or commissioned"—are *not* works for hire unless the work comes within the nine narrow statutory categories *and* parties agree in a signed instrument. Section 101(2) is really statutory *permission* for certain kinds of

independent contractors to give "authorship" to their buyers.

*Id.* at 329 (footnote omitted).[9] As the Fifth Circuit noted, the enumeration in subsection (2) affords telling support for the literal interpretation, for a common thread unites the nine precisely-defined categories: "All involve situations where, in addition to owning the copyrights in the works by contract, it would be very useful for [commissioning parties] to be able to become statutory 'authors.'" *Id.*[10]

We are particularly impressed by scholarly commentary on the legislative history of the 1976 Act and the almost unanimous support that commentary provides for the literal interpretation. *See* W. PATRY, LATMAN'S THE COPYRIGHT LAW 122 (6th ed. 1986) ("Congress adopted the Copyright Office's intent to limit the types of works created by independent contractors that could be deemed works made for hire to the specified examples given in the second subdivision of the statutory definition, ensuring that, contrary to some decisions construing Section 26 of the 1909 Act, works made for hire within the meaning of the 'first' definition would be limited to salaried or like employees and would *not* include independent contractors even if their work was closely supervised or controlled. The second subdivision of the 'work made for hire' definition was thus intended to be the exclusive provision governing works created by independent contractors.") (footnote omitted); A. LATMAN, R. GORMAN, & J.

---

9. The Fifth Circuit employs the terms "buyer" and "seller" throughout its opinion. "A 'buyer' is the putative legal employer claiming ownership under the 'work for hire' doctrine"; "a 'seller' is the person against whom a buyer claims, whether an employee or an independent contractor." *Easter Seal Society*, 815 F.2d at 329. We have employed, in place of the Fifth Circuit's "buyer" and "seller," the terms "commissioning party" and "commissioned party" or "independent contractor."

10. CCNV argues that Reid should be precluded from urging before this court the Fifth Circuit's interpretation of the work for hire doctrine because he relied on the Second Circuit's view of the doctrine before the district court. CCNV incompletely portrays the record. The Fifth Circuit decision in *Easter Seal Society* had not yet issued at the time of the district court's

decision in this case, but Reid in fact tendered to the district court an alternate position on all fours with the one thereafter announced in *Easter Seal Society*. In his Answer, for example, Reid asserted that "the sculpture is not a 'work for hire' in that [Reid] was never an employee of [CCNV], and that under the [1976 Act] the subject matter of the work did not come within the purview of the designated categories of [17 U.S.C. § 101(2)]...." Answer to Complaint for Declaratory Judgment ¶ 8. Similarly, in his Pre–Trial Statement, Reid maintained that he is not an employee, that no written agreement figures in this case, and that the work at issue does not fall within the nine categories enumerated in § 101(2). Defendant's Pre–Trial Statement at 7–8. These passages, one need not strain to recognize, advance the "literal interpretation."

GINSBURG, COPYRIGHT FOR THE EIGHTIES: CASES AND MATERIALS 242 (2d ed. 1985) ("[D]id the [*Aldon Accessories*] court improperly blur an attempted statutory distinction between works created by 'employees' and 'specially ordered or commissioned works,' a distinction designed by Congress to give commissioned persons greater copyright ownership rights than they had under the 1909 Act cases?"); Fidlow, *The "Works Made for Hire" Doctrine and the Employee/Independent Contractor Dichotomy: The Need for Congressional Clarification,* 10 HASTINGS COMM/ENT L.J. 591 (1988); Hamilton, *supra,* at 1292–93 ("[F]rom a preliminary draft that excluded all commissioned works from the work-made-for-hire rubric, the copyright law revision developed into a final bill wherein only certain, specified categories of commissioned works could be considered as works made for hire.") (footnote omitted); Litman, *Copyright, Compromise, and Legislative History,* 72 CORNELL L. REV. 857, 900–01 (1987); Note, *The Freelancer's Trap: Work for Hire Under the Copyright Act of 1976,* 86 W. VA. L. REV. 1305, 1321 (1984) ("With regard to works prepared on special order or commission, the ... definition [of the 1976 Act], which alters completely the status of commissioned works, represents a compromise which, in effect, spells out those specific categories of commissioned works that can be considered works made for hire under certain circumstances.") (footnote omitted); *see also* 1 M. NIMMER & D. NIMMER, *supra* note 7, § 5.03[B][2][a], at 5–18 (apparently supporting the literal interpretation but attempting to reconcile contradictory cases); Angel & Tannenbaum, *supra* note 7, at 293 (writing in support of literal interpretation at time 1976 Act was enacted). *But see* O'Meara, *"Works Made for Hire" Under the Copyright Act of 1976—Two Interpretations,* 15 CREIGHTON L. REV. 523 (1982) (supporting conservative interpretation discussed *infra*).

The Fifth Circuit referred next to the "conservative interpretation," one that preserves in large part the work for hire doctrine developed under the 1909 Act. *See* 815 F.2d at 331. The critical questions for the "conservative interpretation" are whether the work was created at the commissioning party's "instance and expense," *id.* at 327, and whether that party "had the *right* to direct and supervise the manner in which the work was being performed." *Id.,* quoting *Murray v. Gelderman,* 566 F.2d 1307, 1310 (5th Cir.1978) ("Actual exercise of [the] right [to direct and supervise the manner in which the work was being performed] is not controlling, and copyright is vested in the employer who has no intention of overseeing the detailed activity of any employee hired for the very purpose of producing the material."); *see also Scherr v. Universal Match Corp.,* 417 F.2d 497, 500 (2d Cir.1969) (same), *cert. denied,* 397 U.S. 936, 90 S.Ct. 945, 25 L.Ed.2d 116 (1970). Under this reading, section 101 carves out a set of very narrow exceptions to the broad "right to control" test, *i.e.,* the familiar right to control test holds sway for all but the nine categories of commissioned works enumerated in subsection (2); for works falling within these categories the statute requires a written agreement to make the commissioning party the author and exclusive owner of the copyright. The district court in the case before us did not distinguish the *Aldon Accessories* "actually sufficiently supervised" interpretation from this conservative "right to supervise" interpretation. Citing *Aldon Accessories* in conjunction with *Murray v. Gelderman,* the district court homogenized the two interpretations, *see* 652 F.Supp. at 1456, just as courts and commentators had blended these readings during the evolution of the work for hire doctrine under the 1909 Act.

The Fifth Circuit commented that the "[conservative] interpretation, unlike the 'literal' one, makes the nine narrow categories in § 101(2) completely mysterious." *Easter Seal Society,* 815 F.2d at 331. Why would Congress want to afford a translator, for example, shelter from an expansive "work for hire doctrine" that leaves a sculptor or a composer unprotected, the *Easter Seal Society* panel asked. The § 101(2) enumeration does make sense, in the context of the "literal interpretation," *Easter Seal Society* observed, because the

activities listed "look like the kind of activities where the buyer normally wants and needs to be a statutory author in order to gain complete initial ownership of a collaborative project." *Id.*

Finally, the Fifth Circuit examined as a "third view" the *Aldon Accessories* "actually sufficiently supervised and directed" test, discussed *supra*. Summarizing its examination, the *Easter Seal Society* court listed four problems with the *Aldon Accessories* approach:

> (1) the [actual control] rule is unnecessary in cases where "work for hire" is raised by the defendant to question the validity of the plaintiff's copyright since any plaintiff who actually controls an independent contractor will be a co-author of the work; (2) it makes the outcome of "work for hire" analysis too fact-specific for each work and therefore less predictable by buyers and sellers; (3) it does not eliminate the need for a determination of employee versus independent contractor since the "actual control" test applies only to independent contractors; (4) it slides too easily into the vague and expansive "right to control" test, as the decision in *Evans Newton* may portend.

*Id.* at 334.

In settling on the literal interpretation as most consistent with the language, history, and policies of the 1976 Act, the *Easter Seal Society* court mentioned two factors that gave it pause. First, the Fifth Circuit panel underscored this § 201(b) language: "In the case of a work made for hire, the employer *or other person for whom the work was prepared* is considered the author for purposes of this title. ..." Under the literal interpretation, the *Easter Seal Society* court observed, those words are operative only as to the narrow class of non-employer commissioning parties "who can be authors by compliance with the requirements of § 101(2)." 815 F.2d at 330. We agree that the § 201(b) words draw

their meaning from § 101, but we do not think that factor renders the literal interpretation problematic.

Second, the Fifth Circuit expressed some doubt whether "Congress intended to *radically* revise 'work for hire' doctrine." *Id.* (emphasis in original). We are less doubtful on that score as well. The legislative history, as cogent commentary recounts, *see supra* pp. 1492–93, reveals both a general concern that creators receive fair recompense and a specific decision, set down in § 101, to separate commissioned works from works made in an employment setting. *See particularly* Hamilton, *supra*, at 1290–94 (observing, *inter alia*, at 1293, that "the amount of deliberations that went into enumerating which types of commissioned works could be treated like employee-created works made for hire indicates that Congress intended for there to be a meaningful distinction between employee-created and commissioned works," thus case law on works made in an employment context "could remain viable," but 1909 Act precedent "relating to commissioned works could not").

Satisfied that the literal interpretation is the one that best suits the 1976 Act, we hold that a copyrightable work of an independent contractor cannot be a work made for hire under the current Act unless that work falls within one of the specific categories enumerated in § 101(2) *and* "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S. C. § 101(2). It follows from this that "Third World America" does not qualify as a work made for hire, for Reid was an independent contractor and not an employee of CCNV within the rules of agency law; [11] furthermore, sculpture surely is not a category of commissioned work enumerated in § 101(2), and no written agreement existed between CCNV and Reid.

---

11. Reid, a fine artist, donated his services, worked in his own studio, and personally engaged assistants when he needed them. Creating sculptures was hardly "regular business" for CCNV. Given these matters of fact, *see* Restatement (Second) of Agency § 220 (1958), we think it evident that Reid was not CCNV's employee, nor do we understand CCNV to contend otherwise.

With the work for hire doctrine removed from the case, we turn to the proper resolution of this controversy.

### III.

CCNV sought a declaration of copyright ownership. We have held that CCNV is not author of a work made for hire and see no other basis for a claim that CCNV is sole owner of copyright in "Third World America." But neither does the existing record bear out Reid's assertion that he is the exclusive owner of copyright in the work. The facts thus far found by the district court, however, indicate that "Third World America" may indeed qualify as a joint work. To guide the district court on remand, we set out here the relevant statutory prescriptions and relate them to the record as it now stands.

"Copyright in a work ... vests initially in the author or authors of the work." 17 U.S.C. § 201(a); "[t]he ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law ...." 17 U.S.C. § 201(d)(1). Neither side contends that any conveyance or operation of law has effected a transfer of copyright ownership in the work in question, thus a determination of authorship of the sculpture will constitute simultaneously a determination of copyright ownership.

"Ownership of a copyright," the 1976 Act states, "is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. "Transfer of ownership in any material object, including the copy ... in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object;[12] nor, in the absence of an agreement, does transfer of ownership of a copyright ... convey property rights in any material object." *Id.* Because material object and copyright do not travel together unless the parties so arrange, Reid's transfer of the "Third World America" figures to CCNV left copyright ownership of the work unaffected.

"Copyright protection subsists ... in original works of authorship fixed in any tangible medium of expression...." 17 U.S.C. § 102(a) (§ 102(a)(5) lists as "[w]orks of authorship" "pictorial, graphic, and sculptural works"). The sculpture in question, it is evident, qualifies for protection as an "original work of authorship." *See, e.g., Alfred Bell & Co. v. Catalda Fine Arts, Inc.,* 191 F.2d 99, 102 (2d Cir. 1951) ("'Original' in reference to a copyrighted work means that the particular work 'owes its origin' to the 'author.' No large measure of novelty is necessary.") (footnote omitted). We consider it plain as well that, intense as CCNV's participation in the project may have been, Reid, as sculptor, contributed more than a minimal amount of creativity to "Third World America." That is enough, once the work for hire doctrine is out of the picture, to render him an author of a protected work.[13] Indeed, Reid contends he is the sole author and exclusive owner of the copyright. We now state why the record before us does not establish that contention.

The idea to be expressed in the work, as the district court indicated, remained constant from the time Snyder and fellow CCNV members first conceived it: the sculpture was to depict "homeless people huddled on a street-side steam grate." 652 F.Supp. at 1454. Reid asserts no large role in the creation of the special effects pedestal designed to simulate a grate emitting steam. CCNV hired a cabinetmaker to construct the steam grate pedestal portion of the sculpture and obtained the special-effects equipment from sources in Holly-

12. The 1976 Act thus definitively rejects the common law presumption, *see Pushman v. New York Graphic Soc., Inc.,* 287 N.Y. 302, 39 N.E.2d 249 (1942), that an artist sells the copyright upon sale of the material object. *See also* 17 U.S.C. § 204(a) (written instrument required to convey copyright); 17 U.S.C. § 301(a) (preemption of state common and statutory law).

13. In this regard, we reject the district court's suggestion that Reid may have played a purely instrumental role in the creation of "Third World America." *See* 652 F.Supp. at 1456 (CCNV "engaged Reid to utilize his representational skills, rather than his original artistic vision ....").

wood. Thus Reid cannot possibly have solely "authored" the steam grate portion of the sculpture. Reid so recognizes; however, he questions whether CCNV is the author of the base, and whether the base is copyrightable.

The 1976 Act defines a joint work as one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. "Third World America," on the record thus far made, fits that description.[14] From the original conception of the work through its completion for display on Christmas Eve 1985, "the modern Nativity scene" appears to have been treated by those who labored to create it as a unitary whole. *See* 652 F.Supp. at 1454. This much, at least, is undisputed: Reid constructed the figures so that they would huddle on, and could be affixed to, the steam grate pedestal; and once the whole was composed, it was not disassembled. CCNV transported the entire work to Reid in January 1986 for the needed repair. Similarly, in March 1986, when CCNV demanded the return of "Third World America," Reid retained the entire construction, not just the figures he had sculpted.

Nor does it appear—again, we caution, from the current record—that the steam grate pedestal is so insignificant a contribution to the work of art that it fails to reflect the requisite "originality" and "authorship." As we have already indicated,

*see supra* p. 1495, the standard for determining whether a creation is an "original work of authorship" is not high. "It suffices if the author refrains from copying from prior works and contributes more than a minimal amount of creativity." A. LATMAN, R. GORMAN & J. GINSBURG, *supra*, at 29; *see also* 1 M. NIMMER & D. NIMMER, *supra* note 7, § 6.03, at 6–6 and § 6.17, at 6–18 (joint authors need not "work in physical propinquity"; their contributions need not be equal either quantitatively or qualitatively; though contribution of each must be more than *de minimis*, one may qualify as a joint author even if his contribution, "standing alone would not be copyrightable").[15]

Reid observed, in resisting joint work characterization, that "[c]opyright protection does not extend to utilitarian works and the base certainly has utilitarian and functional aspects." Reply Brief at 17. The first part of this observation is more secure than the second. The 1976 Act defines "useful article" as one "having an intrinsic utilitarian function *that is not merely to portray the appearance of the article* ...." 17 U.S.C. § 101 (emphasis added). The steam grate pedestal on which "Third World America's" figures huddle surely was designed and constructed precisely "to portray the appearance of" an actual streetside grate.

Most prominently undercutting Reid's claim of sole authorship, the district court

---

**14.** Reid objects to our consideration of CCNV's suggestion that it is "*at the very least* joint owner of the copyright in the statute ...." Brief for Appellee at 24 n. 15. Joint ownership, Reid maintains, was not urged before the district court. As we observed *supra* note 10, the Fifth Circuit decision in *Easter Seal Society* had not yet issued at the time of the district court's decision declaring CCNV sole owner of the copyright. Our adoption of the "literal interpretation" has so fundamentally changed the legal framework for this case that we deem it in order now to entertain CCNV's alternate joint authorship claim. We refrain, however, from ruling dispositively on the issue; instead, we accord Reid an opportunity to develop before the district court any factual or legal arguments he wishes to present in answer to CCNV's alternate claim to joint authorship. *See Meehan v. Macy*, 425 F.2d 469, 472 (D.C.Cir.1968) (analyzing nature and implications of intervening Su-

preme Court decision but ordering remand to "permit introduction of additional evidence and argument on points that have a significance ... previously only dimly discerned"), *aff'd per curiam on rehearing en banc*, 425 F.2d 472 (D.C. Cir.1969); *see also Thompson v. Kennickell*, 836 F.2d 616, 621 (D.C.Cir.1988) (remanding in light of intervening Supreme Court decision).

**15.** If Nimmer is correct on the point that the contribution of a joint author need not be copyrightable "standing alone," even CCNV's choice of the title "Third World America" and the legend for the pedestal, 652 F.Supp. at 1454, while not indepedently copyrightable, *see* W. PATRY, *supra*, at 45–47, may count, along with other CCNV contributions, toward meeting the "more than *de minimis*" threshold required for joint authorship.

found that CCNV "was the motivating factor in the procreation of 'Third World America,'" "conceived the idea in starkly specific detail," and "directed enough of [Reid's] effort to assure that, in the end, he had produced what [CCNV] not he, wanted ...." 652 F.Supp. at 1456.[16] In making this point, we do not overlook the "idea/expression dichotomy"; as stated in the 1976 Act, "[i]n no case does copyright protection for an original work of authorship extend to any idea ... regardless of the form in which it is ... embodied in such work." 17 U.S.C. § 102(b). *See, e.g., Meltzer v. Zoller,* 520 F.Supp. 847, 857 (D.N.J.1981) (dispute over copyright interest in architectural plans for plaintiff's home; plaintiff contributed ideas and sketches, made certain changes, and exercised approval power; plaintiff's contributions were held insufficient to constitute "fixed expressions of ideas," hence plaintiff could not be considered an "author" or "joint author" of the plans); *see generally,* W. PATRY, *supra,* at 116. "Third World America," however, was more than CCNV's abstract idea. Following CCNV's original conception of the sculpture, Snyder and other CCNV members, the district court found, monitored the progress of the work, not simply to approve Reid's embodiment of their idea, but to guide his expression and coordinate with his effort CCNV's construction of the steam grate pedestal. *See* 652 F.Supp. at 1455–56.[17]

In sum, were it not for the prevailing confusion over the work for hire doctrine,[18]

this case—once more taking the record in its current state—might qualify as a textbook example of a jointly-authored work in which the joint authors co-own the copyright. We note in this regard Reid's original and creative contribution to the figures; CCNV's contribution to the steam grate pedestal added to its initial conceptualization and ongoing direction of the realization of "Third World America"; and the various indicia of the parties' intent, from the outset, to merge their contributions into a unitary whole, and not to construct and separately preserve discrete parts as independent works. *See Strauss v. Hearst Corp.,* 1988 Copyright L. Rep. (CCH) ¶ 26,244 (S.D.N.Y.) (magazine's initial conceptualization, ongoing supervision, and creative contributions to photo layout indicate co-authorship of joint work with photographer). We do not instruct the final decision, however, so that Reid may have a full and fair opportunity to rebut CCNV's joint ownership claim and to pursue a question Reid has raised regarding the identity of potential joint authors.

■ Reid observes that CCNV engaged others to construct the pedestal and supply its components; he asserts that "the Court has insufficient information before it to determine whether CCNV is in fact the 'author' of the base." Reply Brief at 17. The possibility of joint authorship was not considered by the district court, and the record on contributions of participants oth-.

---

**16.** The district court found, in particular, after hearing conflicting testimony, that the reclining, rather than standing or sitting, posture of the figures was CCNV's idea, not Reid's, and that it was also CCNV's idea to use a shopping cart instead of suitcases or shopping bags as the repository for the homeless family's belongings. 652 F.Supp. at 1455 & n. 5.

**17.** Case law concerning joint authorship in relation to the idea/expression dichotomy is sparse largely because the broad scope of the work for hire doctrine under the 1909 Act tended to draw disputes in which one party claimed to be the creative motivating force in the production of a copyrightable work into the ambit of that doctrine. With the substantial cutback of the work for hire doctrine under the 1976 Act, more cases of this genre can be expected to appear under the joint authorship rubric.

**18.** The *Easter Seal Society* court stated that the work for hire claim made in that case would probably have failed on any view of the 1976 Act. The tapes there in question had been "commissioned as part of an audiovisual work within the meaning of § 101(2)," 815 F.2d 336; under § 101(2), such a work constitutes a work for hire only if the parties, in a signed writing, "expressly agree" to that designation. In this case, no such alternate ground of decision is available, and conflict with *Aldon Accessories* is unavoidable. Had we determined that the "sufficiently supervised and directed" test framed in that case correctly construed the 1976 Act, we would have affirmed the district court's judgment declaring Mitch Snyder, as trustee for CCNV, exclusive owner of copyright in the sculptural work "Third World America."

er than Reid and CCNV is limited. We do know, not only that CCNV engaged others, but that Reid himself was "assisted at various times by a dozen different people, all paid by him, from funds .... provided by CCNV." 652 F.Supp. at 1455. It may well be that all other participants in the composition of "Third World America" were either (1) employees of Reid or CCNV within the applicable rules of agency law, *see Easter Seal Society*, 815 F.2d at 329 & n. 11, 335–36 & n. 20, and therefore subject to the work for hire doctrine, or (2) artisans carrying out specific orders, *i.e.*, workers who did not meet the "more than *de minimis*" standard of originality and creativity, *see supra* p. 1496, needed to qualify for authorship. We are not prepared to rule definitively on this issue, however. We therefore refer the matter to the district court with instructions to determine if there are any other parties who might qualify as "Third World America" authors and, on that account, should be joined in this action. *See* FED.R.CIV.P. 19; 7 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1614, at 140 (1972).

■ We address, finally, a peculiar feature of this case noted earlier, *see supra* note 4, one on which the parties' presentations are cloudy. There is only one "copy" of the copyrighted work at issue, and that only existing copy is exclusively owned by CCNV. Joint authors co-owning copyright in a work "are deemed to be tenants in common," with "each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby." W. PATRY, *supra*, at 116 (footnotes omitted). In the absence of an agreement specifying otherwise, any profits earned are to be divided equally, "even where it is clear that [the] respective contributions to the joint work are not equal." 1 M. NIMMER & D. NIMMER, *supra* note 7, § 6.08, at 6–20 (footnote omitted). But singular works of art, we recognize, do not fit comfortably into a scheme centrally concerned with reproduction of the underlying work. *See* BRENNER, *A Two–Phase Approach to Copyrighting the Fine Arts*, 24 BULL. COPYRIGHT SOC'Y 85, 85 (1976–77).

Reid, as we mentioned earlier, objected to CCNV's travel plans for "Third World America," and planned a more modest exhibition tour of his own. *See* 652 F.Supp. at 1456. Co-ownership (or even sole ownership) of the copyright does not appear to carry with it a right to stop or limit CCNV's tour or to gain possession of the unique work of art. *See* 17 U.S.C. § 109(a), (c). Snyder once invited Reid to have a "master mold" of the sculpture made at Reid's own expense. *See* 652 F.Supp. at 1456. We have so far come upon no current authority for a court to order renewal of that invitation. *But see Baker v. Libbie*, 210 Mass. 599, 606, 97 N.E. 109, 111–12 (1912) (writer of letter retains copyright; but recipient or present possessor has right to destroy letter itself; yet ownership of copyright "involves a right to copy or secure copies[,] [o]therwise, the author's right of publication might be lost").

If CCNV reproduces "Third World America" in any medium and profits thereby, however, an accounting would be due to Reid as a copyright owner. Independent of Reid's ownership of the copyright, CCNV might be obliged to credit Reid as an author of the sculpture. *Cf. Smith v. Montoro*, 648 F.2d 602 (9th Cir.1981); *Dodd v. Fort Smith Special School Dist. No. 100*, 666 F.Supp. 1278, 1284–85 (W.D.Ark.1987); *Follett v. Arbor House Publishing Co.*, 497 F.Supp. 304, 311 (S.D.N.Y.1980) (all three decisions concern correction under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1982), in attribution of authorship or representation of a creator's role). Furthermore, Reid, as an author, may have rights against CCNV should it publish an excessively mutilated or altered version of "Third World America." *See Gilliam v. American Broadcasting Co.*, 538 F.2d 14 (2d Cir.1976); Kwall, *Copyright and the Moral Right: Is an American Marriage Possible?*, 38 VAND. L. REV. 1, 17–34 (1985) (discussing various common law and statutory doctrines available to protect a creator against publication of excessively mutilated versions of his work but not against de-

struction); Final Report of the Ad Hoc Working Group on U.S. Adherence to the Berne Convention, *reprinted in* 10 COLUM.-VLA J. LAW & ARTS 513, 547–57 (1986) (current protection of moral right under U.S. common law doctrines and statutes sufficient to meet moral rights requirements of Article 6*bis* of Berne Convention for the Protection of Literary and Artistic Works).

## CONCLUSION

For the reasons stated, we conclude that the district court incorrectly held the work for hire doctrine applicable to the dispute between Reid and CCNV over copyright in the sculptural work "Third World America." We therefore reverse the judgment from which this appeal has been taken and remand the case for further proceedings consistent with this opinion, particularly, for comprehensive consideration whether the sculpture called "Third World America" is a joint work and, if it is, for determination of the owners of copyright in the work.

*It is so ordered.*