**STEVE ALTMAN PHOTOGRAPHY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 378–84 C.

United States Claims Court.

Sept. 29, 1989.

John M. DiJoseph, Arlington, Va., for plaintiff.

Jeffrey H. Nelson, Washington, D.C., with whom was Stuart E. Schiffer, Acting Asst. Atty. Gen., for defendant.

## OPINION

RADER, Judge.

Mr. Steve Altman, plaintiff, is a professional photographer. In 1981, the Overseas Private Investment Corporation (OPIC) commissioned plaintiff to make a photographic record of its projects in the Caribbean Islands. After OPIC had published many of his photographs in its 1981 annual report, plaintiff requested return of all the color slides from his two Caribbean trips. According to plaintiff, OPIC did not return 600 of these slides. Plaintiff seeks damages for these purportedly lost slides.

Plaintiff also claims that OPIC infringed his copyrights. The copyright infringement claim arises from two photography

assignments which plaintiff performed for OPIC in 1982. In the first, Mr. Altman photographed a White House ceremony featuring President Ronald Reagan and Mr. Craig Nalen, OPIC's president. Later OPIC released this photograph to a national business magazine without seeking plaintiff's approval.

In the other assignment, plaintiff took executive photographs of OPIC's Board of Directors for publication in the agency's 1982 annual report. Seven of the portraits appeared in OPIC's 1983 annual report without Mr. Altman's approval. For these two allegedly unauthorized uses of his work, plaintiff seeks reasonable copyright royalties.

Defendant also has a counterclaim against plaintiff. OPIC purchased some photographic equipment for plaintiff's use during the Caribbean assignment. Plaintiff did not return the equipment to OPIC. Defendant seeks compensation for the missing equipment.

On July 26, 1984, plaintiff filed this case in the United States Claims Court. The case was assigned to this court on October 18, 1988. After a trial held in Washington, D.C., from April 12 through April 14, 1989, this court determines plaintiff did not prove that OPIC lost any of his slides. OPIC, however, must compensate plaintiff for the unauthorized use of his portrait photographs. Plaintiff had authorized OPIC to release the White House picture. Finally, this court also grants defendant's counterclaim. Therefore, the amount of the counterclaim reduces the compensation due to plaintiff under his copyright claim.

## FACTS

In 1981, OPIC sought a professional photographer to take pictures of the agency's projects in the Caribbean basin. Mr. Robert L. (Buck) Jordan, OPIC's Director of Public Relations, met Mr. Altman when he came to photograph OPIC's president for a business magazine. Transcript of Proceedings, No. 378–84C, filed May 25, 1989, at 458–61, 610 (Tr.). Upon learning that plaintiff had extensive experience producing photographs for annual reports, Mr. Jordan

began negotiations to hire plaintiff for the Caribbean project.

### Contract for the Caribbean Assignment

Mr. Altman requested his normal fee of $500.00 per day. Mr. Jordan responded that the agency usually paid $325.00 per day for professional photographers. Tr. at 461–2. Because plaintiff understood that he could market the pictures after OPIC published its report, plaintiff agreed to the lower fee. Tr. at 461–62, 466–67. With that understanding, plaintiff submitted an estimate of his costs on October 7, 1981. Mr. Jordan responded that plaintiff would have the contract to shoot the 1981 OPIC annual report. Tr. at 462.

During October 1981, plaintiff and Mr. Jordan met several times to discuss the upcoming OPIC missions to the Caribbean. Usually these meetings focused on the itinerary of the assignment. Tr. at 462–63. Mr. Jordan and plaintiff also discussed what would happen to the slides after publication of the annual report. Plaintiff mentioned that he had other uses, specifically resale on the stock photography market, for the slides after completion of the report. Tr. at 461–62, 614, 686. Mr. Jordan had no objection to returning those slides not used in the annual report to plaintiff because OPIC's slide library was already extensive. Tr. at 615–16.

During one of these meetings, Mr. Jordan took plaintiff to see Mr. Walter Barnes, Jr., OPIC's contracting officer. Mr. Barnes and plaintiff negotiated the contract for the Caribbean assignment. Two issues arose during the negotiations: ownership of the slides after publication of the annual report, and ownership of the photography equipment purchased with OPIC funds for use on the Caribbean assignment. Tr. at 364.

At the outset of the negotiations, Mr. Barnes gave plaintiff a draft contract patterned after contracts OPIC had executed with other professional photographers. This draft contract contained provisions stating that OPIC would own and possess all slides produced during the Caribbean shoot. Tr. at 369–71, 380. Mr. Altman

objected to these provisions. Tr. at 369–71, 464. Plaintiff wanted to market the images after publication of the annual report. Tr. 464–66. In these negotiations, Mr. Barnes strove to ensure that OPIC would not have to pay plaintiff for any future use of the slides. Tr. at 381. After discussions to accommodate plaintiff's objections, Mr. Barnes redrafted the contract. Tr. at 373.

On the question of slide ownership, the contract, without typographical error, stated:

### 9. RESIDUAL RIGHTS TO PHOTO-GRAPHS

a. OPIC reserves the right to unlimited use of all photographic materials produced under this contract for OPIC produced or commissioned publications.

b. The conditions for the release of materials produced by the Contractor under this Contract to other activities must be negotiated with the Contractor prior to release of any materials.

Joint Memorandum Re: Stipulations, No. 378–84C, filed Feb. 1, 1989, at ¶ 3 (Stip.). Mr. Barnes testified about the meaning of this language:

Q [Plaintiff's counsel]: Altman could do whatever he wanted to do with the images as long as OPIC had access for unlimited use, true?

A [Walter Barnes]: Yes.

Tr. at 381. Moreover, Mr. Barnes agreed that OPIC access to a duplicate set of the Caribbean slides would satisfy the agency's rights under clause 9 of the contract. Tr. at 382.

On the other issue in the negotiations, the parties agreed that OPIC would own any equipment purchased with OPIC funds for use on the Caribbean trip. Thus, the compromise that produced the assignment contract gave OPIC unlimited use of the slides and ownership of the photography equipment. The compromise gave plaintiff the right to license the images and to receive compensation for his daily services in

the Caribbean. Tr. at 465. With these understandings, the parties executed the contract on October 31, 1981.

*Caribbean Trips*

Under the contract, plaintiff travelled to the Caribbean twice. In November 1981, plaintiff spent 15 days photographing several OPIC projects. In December 1981, plaintiff accompanied another OPIC mission to the Caribbean for 19 days. The images taken by plaintiff—a sample of which the court viewed during trial, Tr. at 756–91—depict, among other Caribbean subjects, a Panamanian pipeline and fish meal processing plant, a Haitian tree farm and leather tanning enterprise, a Honduran machinery factory and printing business, a Costa Rican flower farm and coffee processing plant, and a Dominican Republic nickel smelting operation.

At the daily rate of $325.00, plaintiff earned $11,375.00.[1] OPIC also reimbursed plaintiff $7,577.00 for his expenses, including travel, lodging, food, and film.

*Accounting for Slides*

During his first visit to the Caribbean, plaintiff exposed 49 rolls of 36–exposure color slide film. Upon return, plaintiff sent these to Asman Custom Photo Service (Asman) for developing. Exhibit (Ex.) 23. Plaintiff picked up the slides on November 17, 1981. While at Asman, plaintiff counted the yellow slide boxes to verify that all 49 were present. Plaintiff also opened each box to see if it appeared to be full of slides. Finally plaintiff inspected one or two slides in each box to check the quality of his work. Tr. at 471–75.

Upon completion of this brief manual inspection, plaintiff immediately delivered these 49 boxes of slides to Mr. Jordan at OPIC. Plaintiff did not count each slide individually before delivery to OPIC. Tr. at 864. A few days later, Ms. Susan English from Graham & Associates, the firm hired by OPIC to produce the annual report, picked up the 49 boxes. Tr. at 319, 331–32.

---

1. Plaintiff billed OPIC for 35 days of services. The extra day plaintiff spent at Mr. Jordan's office sorting and marking slides taken during his second trip. Transcript of Proceedings, No. 378–84 C, filed May 25, 1989, at 491–92 (Tr.).

Meantime, in December, plaintiff again departed with an OPIC mission to the Caribbean. While on this second trip, plaintiff learned of an opportunity to take advertising photos for another client. OPIC did not object to this additional project; in fact, Mr. Jordan facilitated the contact between the other client, Mr. Warren Krey of Dancer Fitzgerald Sample, Inc. (Dancer), and plaintiff. Tr. at 483–84. Dancer wanted plaintiff to take pictures in the Caribbean for an advertisement that would appear in the OPIC annual report.

This additional advertising project required plaintiff to photograph a businessman in a three-piece suit on a beach. After some difficulty finding a businessman to serve as the subject of the photo, plaintiff took 15 rolls of film for the Dancer advertisement. Tr. at 484–86; Ex. 10.

When he returned from his second Caribbean trip, plaintiff again took his film to Asman for developing. On December 22, 1981, plaintiff retrieved 57 rolls of film from Asman. Tr. at 487; Ex. 22. Plaintiff had again used 36–exposure color slide film. As with the earlier batch of 49 rolls, plaintiff examined and counted each box. Tr. at 487–88.

Plaintiff took the 57 boxes of developed film to his home. Plaintiff, however, did not deliver any slides from the second trip to Mr. Jordan at OPIC for two or three weeks. From December 22, 1981 to early January 1982, the slides taken during the second trip remained at plaintiff's home. Tr. at 881–83. During this time, plaintiff marked each slide individually with his copyright notice. Although taking time to mark each slide, plaintiff did not follow his general practice—and the customary practice within the profession, Tr. at 155, 250—of counting each slide individually before delivery to his client. Tr. 864, 882, 885. Plaintiff also displayed some of the slides to Ms. Delores Littles after a dinner engagement. Tr. at 338, 348–49.

Early in January, plaintiff delivered the film from the second trip to Mr. Jordan at OPIC. Plaintiff at that time delivered 37, rather than 57, rolls of film to OPIC. Five of the 57 rolls retrieved from Asman were pictures plaintiff took for individuals who had assisted him during his trip. Plaintiff intended to send these pictures to these individuals in the Caribbean to thank them for their assistance. Therefore, plaintiff did not give these five rolls to Mr. Jordan. Tr. at 489–91, 871–72. In addition, the weight of the evidence shows that 15 of the 57 rolls were the pictures taken for Dancer's advertisement. Plaintiff sent those 15 rolls to Dancer on December 23, the day after fetching them from Asman. Thus, plaintiff delivered 57 minus 20, or 37, rolls to OPIC early in January.

As mentioned above, plaintiff retrieved 57 rolls of film from Asman on December 22, 1981. On December 23, 1981, plaintiff sent to Dancer 15 rolls of film. Ex. 10. At his depositions in August 1987 and October 1988, when perhaps his memory was fresher, plaintiff twice testified that the 57 rolls "could have" included the 15 rolls for Dancer. Tr. at 872–75.[2] Other evidence presented at trial corroborated plaintiff's deposition testimony that the 57 rolls included the 15 rolls for Dancer.

Although he testified at trial that he sent the 15 rolls to Dancer undeveloped, Tr. at 934–36, plaintiff billed Dancer for development of the film. Ex. 10. Plaintiff's invoice to Dancer bills the advertising firm for "Film—$105.00 [for] 15 rolls of color *and processing.*" Ex. 10 (emphasis added). Plaintiff developed the 15 rolls before sending them to Dancer. Thus, the invoice shows that plaintiff sent Dancer 15 rolls of developed film on December 23, after retrieving 57 rolls of developed film from Asman on December 22. The invoice thus supports an inference that the 57 rolls developed by Asman included 15 rolls for Dancer.

The slides themselves carry markings indicating that Asman developed both the Dancer slides and the OPIC slides. During the slide show conducted for the court dur-

**2.** As clarified by the context of the deposition and the April 1989 trial, plaintiff mistakenly recalled that he shot 7 rolls of film for Dancer, rather than 15. Exhibit 10 (Ex.), however, clarifies that plaintiff sent 15 rolls of film to Dancer.

ing trial, a slide taken for Dancer appeared on the screen. Tr. at 764. This court noted that plaintiff appeared unnerved by the appearance of this slide and attempted to switch swiftly to the next slide without commentary. Later, plaintiff compared the border markings on this Dancer slide to the border markings on an OPIC slide. Both bore the designation "DEC W5." Tr. at 946–49. "DEC" referred to the date of development, confirming that both slides were developed in December, the same month that plaintiff delivered and retrieved slides from Asman. Plaintiff also testified that the "W5" designation could refer to the film developing laboratory. Tr. at 950–52. In any event, the identical markings suggest that the slides were processed at the same time and place. Plaintiff also noted that Dancer, a New York firm, would not have used Asman, a Washington, D.C. film processor, to develop its film. Tr. at 952.

In addition, both the Dancer slide and the OPIC slide carried the Kodak logo. Tr. at 946–49. Plaintiff testified that Dancer returned its unused photos to him in gray, non-Kodak boxes, suggesting that if Dancer developed the 15 rolls itself, it might have used a non-Kodak laboratory. Tr. at 935. Plaintiff's testimony appeared to be an attempt to distinguish the Dancer slides from the rest of the Asman slides. The actual Dancer slide that appeared in court, however, bore a Kodak label, further showing that the 57 rolls of film developed by Kodak for Asman included the 15 rolls of film for Dancer. Thus, the invoices and slides associated with the Dancer shoot corroborate plaintiff's deposition testimony that the 57 rolls of film retrieved from Asman included 15 rolls for Dancer.

Of the 57 rolls of film shot in the Caribbean and developed by Asman, plaintiff sent 15 rolls to Dancer in New York on December 23 and held out another five rolls of "thank you" photographs for people in the Caribbean. Therefore, plaintiff delivered 37 rolls of film to Mr. Jordan at OPIC early in January. Plaintiff had delivered 49 rolls to OPIC after his first Caribbean trip.[3] In sum, plaintiff delivered at most 86 rolls of film to OPIC from both trips to the Caribbean.

*Custody of Slides After Delivery*

After delivery by plaintiff, the slides remained in Mr. Jordan's office until Ms. English came to get them. Mr. Jordan, a very credible gentleman with many years of devoted public service, testified that, in many years, no slide has been reported lost from his office. Tr. at 632–33, 684–85.

Ms. English took the slides from Mr. Jordan's office to her own office. While selecting the best pictures, Ms. English commingled the slides from the first and second trips. Tr. at 319, 325–26. Ms. English and her associates chose the best slides for publication in OPIC's 1981 annual report. Ms. English testified that she lost no slides and that she has never, in fifteen years, lost a slide. Tr. at 329–30. Mr. Robert Crozier, who worked with Ms. English in designing the annual report, also testified that Graham & Associates lost no slides. Tr. at 207–08.

*Slides Returned to Plaintiff*

In March 1982, Ms. English returned all the unused slides to Mr. Jordan. After publication of the report, Ms. English returned the rest of the slides. Tr. at 636. In April 1982, plaintiff requested return of the slides. Mr. Jordan returned almost immediately a large number of slides that remained in yellow boxes. Tr. at 497–99, 890. Plaintiff, however, had at the time of delivery segregated many slides into transparent slide sleeves. Plaintiff noticed that the yellow boxes did not contain the slides published in the annual report as well as many slides he had placed into these slide sleeves. Tr. at 498. Plaintiff repeatedly requested return of the remaining slides.

A few months passed during which plaintiff performed other assignments for OPIC. Mr. Jordan, anxious to maintain his friendship and working relationship with plaintiff, promised repeatedly to seek the

---

**3.** The two film invoices from Asman (Ex. 22, 23) are the only documentary evidence presented by plaintiff indicating the number of rolls "delivered" to OPIC for the 1981 annual report. Tr. at 629–30.

rest of the slides. Often OPIC returned unused slides to hired photographers. Tr. at 641–42. At length, Mr. Jordan told plaintiff to come to his office and get the remaining slides. Tr. at 501. When plaintiff picked up the remaining pictures in slide sleeves, however, he felt that many were missing. Tr. at 501. At that point, for the first time, plaintiff counted each slide with the assistance of an adding machine. Tr. at 502. The total number of slides returned to plaintiff, both in yellow boxes and in slide sleeves, was 2,691. Tr. at 503; Ex. 3. Plaintiff continued to feel that slides were missing.

Plaintiff called Mr. Jordan and requested return of any remaining slides. Mr. Jordan promised to look for additional slides [4], but never found any beyond those used in the annual report. Tr. at 646. Mr. Jordan did not return the slides used in production of the annual report—at first because they remained at the design house, Tr. at 637, and later because they were the kind of slides OPIC would keep in its film library. Tr. at 641. These slides have remained in OPIC's custody. Mr. Jordan testified that he did not believe OPIC lost any slides. Tr. at 646. With the slides from the annual report retained by OPIC, the total number of existing slides from plaintiff's Caribbean assignment is 2,807. Tr. at 564–68; Ex. N.

*White House Photograph*

In 1982, plaintiff continued to do photography work for OPIC. On one occasion Mr. Jordan's supervisor, Ms. Barbara Miller, learned of an important ceremony at the White House only a few days before the event. She scrambled to find a photographer. OPIC had already retained Mr. Altman's services to photograph a State Department conference on the same day, September 20, 1982. Ms. Miller requested plaintiff by telephone to also accept the White House job. Plaintiff accepted. The

telephone conversation was short and did not address copyrights or reproduction rights. Stip. ¶¶ 9–11.

The White House ceremony featured OPIC's President, Mr. Nalen, presenting an oversized $50 million check to President Reagan. This presentation symbolized OPIC's return of the original start-up costs of the agency to the United States Treasury. The White House ceremony commemorated a landmark event for OPIC.

Plaintiff rode to the White House event in a car supplied by OPIC. On the way to the event, Ms. Miller instructed plaintiff to photograph Mr. Nalen and President Reagan during presentation of the check and to include the Presidential Seal on the dias in the picture. Ms. Miller, however, did not select the lens setting, the shutter speed, the angle of view, the type of lens, the type of film, or the method of film development for the White House photo. Tr. at 451A–51D. Plaintiff used his professional skill in selecting the camera settings and development processes to produce the White House picture. The entire ceremony, as viewed by the court on videotape during the trial, lasted only a few minutes. The check presentation lasted only a few seconds. Plaintiff had only a few moments to take the requested pictures.

When plaintiff arrived at the White House, he was the only still photographer allowed to photograph this ceremony. Tr. at 578, 581. Due to other news events of that day, the White House had restricted the normal traffic of still photographers. Thus, the White House photo taken by plaintiff became an exclusive picture of a rare event—an agency returning money to the Treasury. Tr. at 581.

On September 23, 1982, plaintiff brought the White House photographs to Mr. Jordan at OPIC. Plaintiff also presented Mr. Jordan with an invoice listing $500.00 as

---

**4.** On one occasion, plaintiff taped a telephone conversation between himself and Mr. Jordan concerning the allegedly lost slides. Despite very minor gaps occasioned by a transcription error, the court admitted into evidence the transcript of that conversation. Tr. at 568–76, 851. In that conversation, Mr. Jordan amicably regretted that he had found no more slides, but

promised again to continue his search. Mr. Jordan also suggested that a movie producer, Len Sugar, who had viewed the slides, might have "marched off with them," but later dismissed his own suggestion: "I'm sure that the guy didn't just up and walk off with them." Ex. 4 at 3, 6.

fee for his services and $63.53 for film development. Ex. 14. The pre-printed invoice form included a printed section entitled "Rights Purchased." In this section, plaintiff had typed the words "Public Relations use by OPIC." Tr. at 596–97; Ex. 14. After the typed portion, the form included a printed paragraph:

> One time, non-exclusive reproduction rights to the photographs described above solely for the usages indicated....

Ex. 14. Plaintiff testified that the "usage indicated" language referred to the public relations use language. Tr. at 596–97, 601.

Plaintiff stated that he intended the words "public relations use by OPIC" to convey the "least possible rights." Tr. at 597. Except for OPIC press releases, plaintiff expected Mr. Jordan to negotiate with him the terms for any other releases of the photograph.[5] Tr. at 597, 600–01.

Later that year, a reporter from *Nation's Business* called Mr. Jordan about the prospect of writing an article about OPIC. The reporter indicated that the article would favorably present OPIC and its mission. Mr. Jordan answered the reporter's questions and sent him copies of several OPIC photos, including the White House ceremony picture. The copy carried plaintiff's copyright notice.

In the February 1983 edition of *Nation's Business*, a two-page article on OPIC appeared under the heading "A Tiny Federal Agency With a Big Paycheck." The article presented in complimentary terms OPIC's expertise in sponsoring small businesses which seek to expand into foreign markets. The article included a small reproduction of the White House ceremony photograph. The picture did not include a credit line mentioning that plaintiff was the photographer. Plaintiff asserts that OPIC's release of the picture to *Nation's Business* exceeded OPIC's license for public relations use.

*Board of Directors' Portraits*

In December 1982, plaintiff also took pictures of most of OPIC's Board of Directors. Mr. Jordan asked plaintiff to take the pictures and attended the portrait sessions. Tr. at 658–59. Mr. Jordan instructed Mr. Altman to take portrait photos of the board members against a neutral backdrop. Tr. at 523–24. Plaintiff used his skill to pose the subjects, put them at ease, and time the photos to get natural and flattering expressions from the board members.

After developing, plaintiff again delivered the photos to Mr. Jordan along with invoices. The pre-printed invoices included the same "one time, non-exclusive use" clause and a "rights purchased" category. The "rights purchased" language stated: "to be used in 1982 annual report and for p.r. release." Plaintiff drafted this language without any input from OPIC. Stip. ¶¶ 21–22; Tr. at 647–48; Ex. I, J, K, L. Plaintiff testified that he intended this "p.r." (public relations) license to carry the same limits as the White House ceremony public relations license. Tr. at 921–22. Thus, OPIC could reuse the photos provided all the uses were for public relations. Tr. at 928–29.

OPIC published several board member portraits in both its 1982 and its 1983 annual reports. Seven portraits from the 1982 report appear in the 1983 report. Tr. at 539–40; Ex. T. Plaintiff asserts that use of these portraits in the 1983 report infringed his copyrights. Before filing this action, plaintiff registered in his name copyrights to the White House ceremony photograph and the seven portrait photographs. Stip. ¶ 25.

*Photographic Equipment*

The contract negotiated between plaintiff and Mr. Barnes stated that OPIC would own any photographic equipment purchased by plaintiff for use during the Car-

---

5. Plaintiff testified at trial that the public relations use language did not cover reproduction of the photograph in OPIC's annual report. Tr. at 600–01. Yet, in earlier depositions, plaintiff had testified that OPIC had told him, in advance of his acceptance of the assignment, that the picture would appear in the annual report. Tr. at 913–15. Indeed plaintiff stipulated his license covered use in OPIC's 1982 annual report. Joint Memorandum Re: Stipulations, No. 378–84C, filed Feb. 1, 1989, at ¶ 17 (Stip.).

ibbean assignment. The contract implicitly required plaintiff to return the equipment to OPIC after the Caribbean project. Stip. ¶ 26. Under these provisions, OPIC reimbursed plaintiff for $562.51 of photographic equipment. Plaintiff did not return the equipment. Stip. ¶ 27.

OPIC's contracting officer concluded that plaintiff breached the contract. Plaintiff learned of this decision in February 1985. Nonetheless, plaintiff failed to appeal that decision to the Board of Contract Appeals within 90 days or to bring an action in the Claims Court with 12 months. Stip. ¶¶ 28–29. Therefore, plaintiff concedes liability for conversion of $562.51 of photographic equipment. Tr. at 34–36; Transcript of Proceedings, No. 378–84C, filed Sept. 19, 1989, at 40 (Tr. II).

### DISCUSSION

Plaintiff seeks damages from OPIC for the loss of 600 slides taken in the Caribbean.[6] To prevail on this claim, plaintiff must show by a preponderance of evidence both that the Caribbean assignment contract gives him ownership of the slides and that OPIC lost 600 slides. Finally, plaintiff must prove, also by a preponderance, the amount of damages he has suffered due to the loss. Based on the facts of this case, plaintiff proved that he owned the slides, but did not prove that OPIC lost any slides. Therefore, OPIC did not damage plaintiff.

*Ownership of Slides*

█ Plaintiff's ownership of the slides depends upon interpretation of the "Residual Rights to Photographs" clause, clause 9 of Contract No. OPIC 82–C–001. Contract interpretation requires this court to ascertain what the parties intended by their writing. *Rice v. United States*, 192 Ct.Cl. 903, 908, 428 F.2d 1311, 1314 (1970); *Dynamics Corp. of Am. v. United States*, 182 Ct.Cl. 62, 72, 389 F.2d 424, 429 (1968). This

court must ascertain that intent by reference to objective manifestations, *David Nassif Assocs. v. United States*, 214 Ct.Cl. 407, 421–22, 557 F.2d 249, 257 (1977), rather than to subjective and unexpressed understandings of the parties. *Dana Corp. v. United States*, 200 Ct.Cl. 200, 214, 470 F.2d 1032, 1041 (1972). An accurate interpretation, therefore, gives meaning to the contract as a whole, *Kenneth Reed Constr. Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973), rather than leaving parts of it meaningless. *Martin Lane Co. v. United States*, 193 Ct.Cl. 203, 215, 432 F.2d 1013, 1019 (1970).

█ In most cases of contract interpretation, the parties do not anticipate at the time of contracting the issues which arise later in a legal dispute. In those instances, the court must determine whether the objective contract language is ambiguous in light of unanticipated circumstances. *See, e.g., Hoppmann Corp. v. United States*, 18 Cl.Ct. 220 (1989); *Hydro Group, Inc. v. United States*, 17 Cl.Ct. 668 (1989); *XXX Constr. Co. v. United States*, 16 Cl.Ct. 491 (1989). In the case at bar, however, the parties discussed and directly negotiated the disposition of the slides after publication of the 1981 annual report. Under this circumstance, the intentions of both parties as expressed during negotiations helps the court ascertain the parties' intent. *Nassif*, 557 F.2d at 257.

█ The parties considered the issue of slide ownership during contract negotiations. Tr. at 461–62. Indeed, plaintiff forced prolonged negotiations by refusing to accept a draft contract which gave OPIC ownership and possession of the slides. Tr. at 464–65. After plaintiff refused to sign OPIC's standard contract, Mr. Barnes, OPIC's contracting officer, met with plaintiff two or three times to discuss the contract terms. Tr. at 362.

---

**6.** Plaintiff actually claims that OPIC lost more than 600 slides. Plaintiff claimed at trial to have delivered 101 rolls of film to OPIC. With 36 exposures to a roll, plaintiff estimated that he delivered 3,636 slides. After Mr. Jordan returned two batches of slides, plaintiff counted 2,691 on his adding machine. Thus, plaintiff assumed that OPIC lost 945 slides. Although at

first confused about the basis for reducing his claim from 945 to 600, plaintiff recalled that he reduced his claim by 300 or so to account for outtakes. Outtakes are unusable photographs created when the photographer "brackets" a subject by shooting the same subject at faster and slower shutter speeds to ensure correct lighting on at least one exposure. Tr. at 501–06.

Throughout these negotiations, Mr. Barnes strove to ensure that "OPIC would have unlimited use of any of the products developed by Mr. Altman...." Tr. at 361–62. Significantly, Mr. Barnes' goal in these negotiations was to secure OPIC's use rights, not its ownership rights. Tr. 361–62. Mr. Barnes expressed to plaintiff during negotiations his emphasis on securing OPIC's "unlimited use" of the slides. Tr. at 364–65. Moreover Mr. Barnes understood that plaintiff objected to the initial OPIC standard contract because it gave OPIC "total possession and ownership of whatever he produced." Tr. at 370.

At length the parties agreed to resolve the ownership issue by employing language about subsequent use of the slides. Mr. Barnes explained his understanding of this language:

> He [plaintiff] had to give us a set of slides in order for us to make our selections and to use those slides whenever we wanted to.
>
> ....
>
> [W]e [plaintiff and Barnes] came to a position that as long as we [OPIC] had the slides and we [OPIC] could use the slides whenever, however we [OPIC] wanted to that—we [OPIC] got the same results [as ownership].

Tr. at 369, 371.

At that point, Mr. Barnes drafted a clause to memorialize the parties' agreement. Tr. at 373, 465. Clause 9 of the contract reflects that agreement. Mr. Barnes entitled this clause "Residual Rights to Photographs," indicating that this language represented the parties' agreement about the disposition of the slides after publication of the annual report. Paragraph "a" of clause 9 gives OPIC "unlimited use of all photographic materials produced under this contract." As indicated by the clause's title, the clause referred to the photographs or slides taken in the Caribbean. The term "photographic materials" means the slides. Tr. at 376. Thus, according to paragraph "a," OPIC received the right to use the slides without restriction or further permission of plaintiff in any OPIC publications. Securing

this right had been Mr. Barnes' top priority in the negotiations.

Paragraph "a" did not secure unlimited use rights, but rather unlimited use rights in OPIC publications. OPIC understood that the contract guaranteed use rights only in connection with OPIC publications. This limit carries the implication that the plaintiff intends to make other uses of the slides outside OPIC publications. Indeed, plaintiff had told OPIC of his intention to market the slides after OPIC had published its annual report. Thus, paragraph "a" of clause 9 contains some clear limits on OPIC's rights to use the slides. Other than OPIC's right to use the slides in its publications, the contract imposes no comparable limits on plaintiff's use of the slides.

Mr. Barnes was also aware that the slides could be duplicated. Tr. at 382. Mr. Barnes also agreed that access to a set of duplicate slides would satisfy OPIC's use rights under the contract. Tr. at 382, 385. In other words, Mr. Barnes stated that OPIC negotiated to acquire use rights for its publications, not ownership of the slides.

Plaintiff also understood clause 9 to give OPIC access to a set of the slides for use in OPIC publications. According to paragraph "b" of the clause, however, neither the original nor the duplicates could be released to a user other than OPIC without plaintiff's permission. Finally and most important to plaintiff, he would have "the right to my property for the purposes of marketing." Tr. at 465. Marketing of the slides, however, required plaintiff to have physical possession. With OPIC's unlimited use rights protected, clause 9 permitted plaintiff to own and market the slides.

The events after plaintiff's return afforded OPIC ample protection for its unlimited use rights. First, OPIC had sole possession of all of the slides for more than four months and of many of the best slides for many more months. In fact, OPIC still has those slides used in the annual report. During this time, OPIC could assess the slides and select those it might use in present or future OPIC publications.

Second, in the time that OPIC had the slides, it could have easily made a duplicate set of the slides it desired to keep. OPIC knew that plaintiff expected to retrieve the slides for marketing. Tr. at 465–66 Indeed plaintiff had expressed this intention prior to and during the drafting of the contract. For this reason, plaintiff had rejected the initial OPIC standard contract, reduced the price of his services (Tr. at 466–67), and required Mr. Barnes to redraft the document. Knowing plaintiff's intent under the contract language and knowing that OPIC had only secured rights to use the slides in OPIC publications, OPIC had the obligation to make copies to protect the rights it had secured. OPIC had ample opportunity to make a duplicate set of slides.

Third, plaintiff also continued throughout the time prior to this lawsuit to make the slides available to OPIC for its use in OPIC publications. Tr. at 521–22. Thus, OPIC could have satisfied its use rights by contacting plaintiff to retrieve any slides needed for a future OPIC publication. Mr. James Pickerell, a noted professional photographer, testified that plaintiff's possession of the slides would not have any effect on OPIC's use rights. Tr. at 290. Finally, if OPIC desired to use the slides other than in "OPIC produced and commissioned publications," paragraph "b" of clause 9 offered OPIC the opportunity to negotiate with plaintiff prior to that other release.

After delivery of the second batch of slides, plaintiff submitted to OPIC an invoice for his services. Tr. at 521–22. This invoice, signed by the contracting officer and Mr. Jordan, contains terms and conditions consistent with plaintiff's ownership of the slides. The contracting officer accepted these terms and conditions by paying off the invoice without raising any questions. These terms help define the intentions of the parties in Contract No. OPIC 82–C–001. The terms and conditions state:

(b) Absent outright purchase, client assumes insurer's liability to (1) indemnify Photographer for loss, damage, or misuse of any photograph(s) and (2) return all photographs prepaid and fully insured, safe and undamaged by bonded messenger, air freight or registered mail, within 30 days of publication. In any event, client agrees to return all unpublished materials to Photographer in the above manner, and supply Photographer with two free copies of uses appearing in print.

Ex. F(1).

Clause 9 of the contract clarifies that OPIC did not purchase the slides outright, but reserved only use rights. Therefore, under these terms and conditions, plaintiff fully expected return of "all photographs ... safe and undamaged." This invoice language reinforces that plaintiff owned the slides subject to OPIC's rights to use them in its publications.

In sum, the contract granted OPIC only use rights with respect to OPIC publications. The contract explicitly granted plaintiff rights with respect to all other uses. As shown by plaintiff's stated intentions that he intended to market the slides elsewhere, his refusal to sign a contract which gave OPIC ownership, and his issuance of an invoice consistent with his understanding, the contract left ownership of the slides with the plaintiff, subject to the uses granted to OPIC in paragraph "a" of clause 9.

*Loss of Slides*

■ Plaintiff owned the slides after publication of OPIC's 1981 annual report. Plaintiff contends that OPIC lost more than 600 slides. Plaintiff bases this contention on the assumption that he delivered 3,636 slides (101 rolls) to OPIC and received back only 2,691. The difference between 3,636 and 2,691 is 945 potentially missing slides. Plaintiff arrived at a figure of 600 missing slides by deducting 345 for unusable "outtakes," a term for blank or defective frames. Tr. at 503–06, 726–27, 877–79.

Plaintiff did not show by a preponderance of the evidence that OPIC lost any of his slides. At the outset, plaintiff did not prove that he delivered 3,636 slides to OPIC. Despite the customary practice among professional photographers of

counting all slides prior to delivery [7] (Tr. at 155–56, 247, 250–53), plaintiff did not individually count the slides until several months after OPIC returned the first batch of slides. Plaintiff was thus responsible for the absence of a reliable and recorded count of the number of slides delivered.

Plaintiff has the burden of proving by a preponderance of the evidence that OPIC lost the slides. In addition, because plaintiff departed from the standard for professional photographers by failing to count slides before delivery, plaintiff must accept responsibility for the inaccuracy of any estimates in accounting for slides.

Based on a preponderance of the evidence, plaintiff delivered, at most, 86 rolls of film to OPIC. If plaintiff exposed 36 usable frames for each roll, a proposition which fails to account for unusable "outtakes," plaintiff may have delivered as many as 3,096 slides to OPIC. The parties accounted for 2,807 slides at the time of trial. The difference between 3,096 potentially delivered slides and 2,807 existing slides is 289 potentially missing slides.

Plaintiff admits that as many as 400 of the delivered slides were useless "outtakes." Tr. at 503–06, 877–79. Defendant's persuasive expert witness, Mr. Elio Battaglia, Picture Editor for Smithsonian's *Air and Space* Magazine with more than 30 years experience with *Time, Inc.* and the United States Information Agency, confirmed that an assignment as large as the Caribbean shoot would have hundreds of useless and defective frames. Tr. at 726–734. Deducting the outtakes from the estimated delivery total of 3,096, as plaintiff did in arriving at his estimate of 600 missing images, would mean that plaintiff delivered 2,696 (with an estimate of 400 outtakes) usable slides, or 2,796 (with an estimate of 300 outtakes) usable slides. Both of these numbers are well within the total of 2,807 existing slides. A difference of this dimension could arise from missed estimates on the number of slides delivered or missed estimates on the number of outtakes.

Even if the court accepted as lost the 289 slides which comprise the difference between the estimated delivery of 3,096 and the 2,807 existing slides, plaintiff has not shown that OPIC lost the slides. In the words of plaintiff's counsel: "There is no smoking gun." Tr. II at 24.[8] This description aptly capsulizes the absence of any specific testimony that OPIC lost a specific number of slides on a specific date due to a specific oversight. Rather, plaintiff asks this court to infer from OPIC's possession of plaintiff's slides for several months that OPIC lost an unspecified number of them during the time it had custody. This court, in the absence of more evidence, cannot draw that inference.

Based on the evidence presented at trial, this court could just as readily infer that the slides were misplaced or lost during the

---

7. One of plaintiff's expert witnesses testified that the professional photography industry has no standard for assessing losses when a photographer does not count the slides individually prior to delivery. Tr. at 158.

8. This comment appears in the following context:

> The Court: But the point is there isn't any testimony that X number of files were lost on X occasion.
> [Plaintiff's counsel]: No. No, there is no testimony because Altman doesn't know that.
> The Court: There was no testimony that anyone counted all the files, I mean all the slides, slide-by-slide.
> [Plaintiff's counsel]: No one did that. I can tell you that.
> The Court: So we're left with the difficulty of estimating the number of slides based on the number of boxes.
>
> [Plaintiff's counsel]: Correct.
> The Court: And then guessing as to whether and as to how many may or may not have been lost, and I'm wondering where in this pile of record that we accumulated is that concrete evidence that I can grab and point out to the parties that will completely convince you that they have been lost.
> [Plaintiff's counsel]: Okay. There is no smoking gun. There is no—no one counted the images image-by-image. The images were in the government's possession, custody and control and I ask you to factor that into evaluating if they were lost and how many were lost. . . .

Transcript of Proceedings, No. 378–84C, filed Sept. 19, 1989, at 24–25.

time that they were in plaintiff's custody. Plaintiff had custody of the slides from the second trip for two weeks or more before delivery to OPIC. During that time, plaintiff marked the slides, sent some to Dancer in New York, and displayed some to friends. Tr. at 883–84. During that period of activity involving the slides, however, plaintiff did not count them individually. Tr. at 885. OPIC returned many yellow boxes of slides to plaintiff in the early spring of 1982—months before plaintiff received back the second batch of slides and performed his first count. Tr. at 890–92. Based solely on inferences linked to custody, plaintiff is as likely as OPIC to have lost slides.

In the imprecise realm of inferences, the trial record reflects that neither Ms. English nor Mr. Jordan have ever lost slides. Mr. Jordan searched extensively for lost slides in conformity with plaintiff's requests, but never found a single slide. Tr. at 646. On the other hand plaintiff, on at least one occasion, commingled slides from the Dancer assignment with slides from the separate OPIC assignment. Tr. at 936; Tr. II at 46–47. From these additional facts, this court cannot conclude that OPIC's possession, rather than plaintiff's, resulted in a loss of slides, if any slides were lost at all.

Plaintiff further asks this court to infer from Mr. Jordan's efforts to accommodate plaintiff's request for return of allegedly lost slides, that slides were indeed lost. As plaintiff testified, Mr. Jordan was always amicable and friendly. Tr. at 894–95. In accord with his agreeable personality and his desire to preserve an ongoing business relationship with plaintiff, Mr. Jordan accommodated plaintiff's requests for a search for lost slides. Tr. at 894–95. Mr. Jordan's accommodating spirit does not show that OPIC lost slides.

At one point, plaintiff recorded a conversation with Mr. Jordan without Mr. Jordan's knowledge.[9] Even under those circumstances, however, Mr. Jordan did not state that OPIC had lost 600 slides. Tr. at 898. Rather, Mr. Jordan engages in banter about the allegedly lost slides and promises to continue looking for them. This court cannot draw any inferences from Mr. Jordan's conduct other than that he was amicable and strove to preserve good relationships with plaintiff. Far from a smoking gun, this court cannot find a cold pistol in Mr. Jordan's conduct.

In sum, a preponderance of the evidence does not show that OPIC lost any slides. In the absence of an accurate count of the slides delivered to OPIC, this court cannot be certain that any loss occurred at all, let alone account for losses with precision. The inferences drawn from OPIC possession or Mr. Jordan's conduct do not support a finding that OPIC lost any slides. Plaintiff has simply not shown that OPIC was responsible for lost slides, if indeed any slides were lost.

*Copyright Claim—White House Photo*

In 1960, Congress amended 28 U.S.C. § 1498 to make the United States liable for copyright infringement:

(b) Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States ... the exclusive remedy of the owner of such copyright shall be by action against the United States in the Claims Court for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of Title 17....

28 U.S.C. § 1498(b) (1982). The Claims Court's predecessor, under the jurisdiction conferred by § 1498(b), applied the substantive law of Title 17 to determine copyright claims against the United States. *Williams & Wilkins Co. v. United States*, 203 Ct.Cl. 74, 487 F.2d 1345 (1973), *aff'd per curiam*, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975).

---

9. This recorded conversation carries all the hallmarks of post-dispute conduct, which robs it of some credibility. Before recording Mr. Jordan's telephonic remarks (itself conduct evincing plaintiff's perception that he was involved in a legal dispute), plaintiff had already discussed the case with his counsel. Tr. at 896–99.

■ Title 17 sets forth the rights of copyright owners. Specifically, § 106 grants copyright owners "exclusive rights to do and to authorize any of the following:

(1) to reproduce the copyrighted work in copies

....

....

(3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership

....

....

(5) in the case of ... pictorial, graphic, or sculptural works ... to display the copyrighted work publicly.

17 U.S.C. § 106 (1982). Thus, the Copyright Act (Act) confers on authors certain monopoly rights to their creations in order to foster creative activity and provide the public with access to the products of their genius after a limited period of exclusive control.[10] *Sony Corp. of Am. v. Universal City Studios,* 464 U.S. 417, 429, 104 S.Ct. 774, 782, 78 L.Ed.2d 574 (1984). Therefore, unauthorized uses of copyrighted works are presumptively unfair exploitations of the copyright owner's monopoly privilege. *Harper & Row, Publishers, Inc. v. Nation Enters.,* 471 U.S. 539, 562, 105 S.Ct. 2218, 2231, 85 L.Ed.2d 588 (1985).

■ Unless plaintiff authorized OPIC's use, OPIC violated the exclusive rights of plaintiff under the terms of § 106 by making copies of the White House photograph and by distributing copies of this copyrighted work to *Nation's Business.* Indeed, § 101 of the Act defines "publication" as, among other things, "offering to distribute copies ... to a group of persons for purposes of further distribution ... or public display...." 17 U.S.C. § 101. If OPIC offered the White House photograph— without authorization—to *Nation's Business* for further dissemination, OPIC published plaintiff's copyrighted work in violation of his exclusive rights.

■ Defendant responds that plaintiff had authorized OPIC's use. In the invoices accompanying the Reagan–Nalen White House photo, plaintiff typed into the space entitled "Rights Purchased" the words, "Public Relations use by OPIC." Ex. 14. Thus, plaintiff authorized OPIC to use the White House photograph for public relations.

This court must interpret the terms "public relations use by OPIC" according to their recognized meanings. *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979). "Public relations" refers to the "business of inducing the public to have understanding for and goodwill toward a[n] ... institution." *Webster's New Collegiate Dictionary,* 932 (1975). Mr. Jordan released a single copy of the White House photo to *Nation's Business* with the intent of improving OPIC's public image via a favorable magazine article. Tr. at 654. Ms. Miller confirmed this public relations purpose for the release. Tr. at 433–34. Mr. Jordan, at the time, was OPIC's Public Relations Director—the individual responsible to improve OPIC's public image. *Nation's Business* was a magazine with appeal to OPIC's actual and prospective clientele. A favorable article in this publication would heighten OPIC's reputation with those it wished most to impress. Mr. Jordan's judgment, later confirmed by the magazine's publication, that the article would improve OPIC's public standing satisfied the terms of plaintiff's license.

Mr. Battaglia testified about another reason that OPIC's release of the White House picture fits within the meaning of public relations. Tr. at 800. OPIC did not sell the photo or its story to *Nation's Business.* Rather Mr. Jordan, without thought of direct commercial gain, helped the magazine to enhance OPIC's image.

Moreover this court must construe any ambiguity in the authorization against the drafter, in this case, plaintiff. *Thanet,* 591

---

**10.** The terms "author" and "copyright owner" are not necessarily synonymous. Title 17 provides that copyright ownership "vests initially in the author or authors of the work." 17 U.S.C.

§ 201(a). In this case, plaintiff is both the author and copyright owner of the White House photograph.

F.2d at 633. Plaintiff testified that he intended the term "public relations use" to carry a very restrictive meaning. Tr. at 596–98. To the extent that the term "public relations" is ambiguous, this court adopts the reasonable and ordinary meaning given to the term by OPIC. This court determines that "public relations" is not ambiguous, but the cry of "ambiguity" does not rescue plaintiff from the terms of a license he alone drafted.

Plaintiff argues, that in the face of plaintiff's copyright notice on the photo, OPIC had a duty to inquire into the "facts concerning the copyright." *Chappell & Co. v. Costa,* 45 F.Supp. 554, 555 (S.D.N.Y.1942). In light of the facts of this case, OPIC had no duty to inquire beyond the plain meaning of the terms of the license. Plaintiff's authorization encompassed OPIC's release of a single copy of a photo to *Nation's Business* to enhance the agency's public image. Having once secured license to use the copyrighted work for public relations, OPIC had no obligation to inquire and reacquire the license each time it used the photograph to improve OPIC's public standing.

Title 17 explicitly gives authors the right to authorize use of their works. Full enjoyment of copyrights includes the power to license, convey, assign, or otherwise dispose of those rights. Plaintiff authorized OPIC to use the White House photo in the very manner in which OPIC used it. Therefore, plaintiff cannot now retract his authorization and complain of copyright infringement.

*Copyright—Board Photographs*

■ The invoices accompanying the Board of Directors' portraits contained different language from the invoice accompanying the White House Reagan–Nalen picture. In the "Rights Purchased" blank, plaintiff typed "to be used in 1982 annual report and for P.R. release." Ex. J, K, L. In addition to publishing the portraits in its 1982 annual report, as authorized, OPIC used seven of these portraits in its 1983 annual report. This use was not authorized. Because it published these copyrighted works without plaintiff's permission, 17 U.S.C. § 106, OPIC infringed plaintiff's copyright.

Defendant contends, once again, that plaintiff had licensed this publication by use of the term "P.R. release." The court understands "P.R. release" to refer to public relations uses as discussed above. With regard to publication of the portraits in an annual report, plaintiff had specifically limited the license to the 1982 annual report. Plaintiff's license did not encompass the 1983 annual report.

In construing the terms of the license, this court must give precedence to narrow, specific language over broad, general language. While contending that the broad language about public relations might authorize publication of the portraits in an annual report, defendant overlooks that the authorization itself discusses specifically annual report usage. The license limits annual report usage to the 1982 annual report. In this case, a cry of "ambiguity" does not rescue defendant because the terms are not ambiguous. "1982 annual report" means OPIC's 1982 annual report and does not include its 1983 annual report. Plaintiff's license does not authorize publication of the seven copyrighted portraits in OPIC's 1983 annual report.

■ Defendant, taking its cue from *Community for Creative Non–Violence v. Reid,* 846 F.2d 1485, 1491 (D.C.Cir.1988), *aff'd,* — U.S. ——, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989), also argues that OPIC was a joint author of the portraits created by plaintiff. In *Reid,* the joint authors both contributed significant artistic portions to the final work. To depict the plight of the homeless, James Reid sculpted three human figures and CCNV made a steam grate and pedestal that emitted simulated steam. 652 F.Supp. 1453, 1454 (D.C. 1987), *rev'd on other grounds.* CCNV actually conceived the idea for the sculpture. *Id.*

Unlike *Reid,* OPIC and plaintiff did not jointly contribute to the conception and artistic production of the portraits. OPIC did no more than ask plaintiff to photograph the Board members in front of a neutral backdrop. Plaintiff, on the other hand, se-

lected all the camera angles, film, and settings to make best use of the light and features of the subjects. Plaintiff also employed his skills to put his subjects at ease and induce them to assume natural and flattering poses. Despite the limits on the artistic value of portrait photographs, plaintiff alone contributed that artistic content. OPIC and plaintiff were not joint authors of the copyrighted works.

The stated intentions of plaintiff further verify that the parties did not jointly author these seven portraits. Joint authors must intend at the time of creation that their contributions be merged into an inseparable work. The United States Court of Appeals for the Second Circuit, in a case cited by both parties in this suit (Tr. II at 5, Defendant's Brief, filed Aug. 2, 1989, at 49), stated the criteria for joint authorship:

> First, each putative author must have "contributed" to the work. Second, each must intend to contribute to a joint work at the time his or her alleged contribution is made.

*Weissmann v. Freeman*, 868 F.2d 1313, 1318 (2d Cir.1989).

Under this standard, defendant does not prove joint authorship. At no point in the trial record does Mr. Jordan testify that he intended by requesting a neutral backdrop to contribute to the joint creation of an artistic work. Plaintiff testified specifically, however, that he did not intend to create a joint work at the time of taking the board member photographs. Tr. at 542–43. Moreover, plaintiff testified that Mr. Jordan did not state any intent to become a joint creator. Tr. 542–43. OPIC and plaintiff were not joint authors of the copyrighted portraits.

OPIC infringed plaintiff's copyrights on the seven board member portraits published in the 1983 annual report. Title 28 U.S.C. § 1498(b) authorizes this court to decide what constitutes "reasonable and entire compensation ... for such infringement...." Plaintiff seeks damages for infringements in the 1983 OPIC report in the amount of $1500.00. Tr. at 540–41, Tr. II at 13–16. This request amounts to $214.28 per photo. Defendant's expert, Mr. Bat-

taglia, testified that a magazine would pay up to $200.00 for a small photograph of President Reagan. Tr. at 807. Pictures of the President differ from pictures of OPIC board members and magazines differ from annual reports. Nonetheless, plaintiff's request is within the zone of reasonableness. This court determines that OPIC damaged plaintiff in the amount of $1500.00 by infringing his copyrights in its 1983 annual report.

*Counterclaim*

Plaintiff concedes that he converted to his own use $562.15 of OPIC's camera equipment. This concession permits this court to award OPIC damages in the amount of $562.15 for plaintiff's conversion.

## CONCLUSION

Contract No. OPIC–82–C–001 entitled plaintiff to ownership of the Caribbean slides after publication of OPIC's 1981 annual report. Plaintiff, however, did not show that OPIC lost any slides. Therefore, this court awards no damages for the allegedly missing slides. OPIC must and the court shall, however, return to plaintiff immediately all 2,807 existing slides taken during the two Caribbean missions. This order covers as well all slides commingled with the Caribbean slides during litigation.

Plaintiff authorized OPIC to release the White House photograph for public relations uses. OPIC's release of the Reagan–Nalen picture fit within that license. In the absence of any infringement, the court awards no reasonable compensation for OPIC's release of the White House picture to *Nation's Business*.

Plaintiff's specific license governing the seven OPIC board portraits did not cover publication of those pictures in the OPIC's 1983 annual report. Moreover OPIC was not a joint author with plaintiff in creation of those copyrighted works. OPIC infringed plaintiff's copyright on the Board portraits, for which the court awards plaintiff reasonable compensation of $1500.00.

Plaintiff converted to his own use $562.51 of OPIC's camera equipment.

Therefore, this court reduces plaintiff's award of $1500.00 by $562.51 to account for defendant's successful counterclaim. In full compensation for all claims instituted by his complaint, plaintiff receives $937.49. This court directs the Clerk of the United States Claims Court to enter judgment for plaintiff in the amount of $937.49, together with interest thereon, calculated pursuant to 41 U.S.C. § 611, as part of plaintiff's reasonable and just compensation.

The interest on $937.49 shall accrue from the date this action was filed in the United States Claims Court, July 26, 1984. Plaintiff converted the camera equipment prior to OPIC's infringement. The 1983 annual report was published in early 1984. Plaintiff registered his copyrights before filing this action. Therefore, the filing date sets a reasonable starting point for computation of interest.

No costs.